980 F.2d 411
 24 Fed.R.Serv.3d 176, Prod.Liab.Rep. (CCH) P 13,352
 Grace TRAGARZ, individually and as Special Administrator of
the Estate of Henry Tragarz, deceased, Plaintiff-Appellee,
v.
KEENE CORPORATION, individually and as successor-in-interest
of the Baldwin-Ehret-Hill Company, and
Owens-Corning Fiberglas Corporation, a
Delaware Corporation,
Defendants-Appellants.
 Nos. 91-2108, 91-2109.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 15, 1992.
Decided Nov. 6, 1992.
Rehearing and Rehearing In Banc
Denied Feb. 18, 1993.
 
 Timothy E. Eble (argued), Ness, Motley, Loadholt, Richardson & Poole, Barnwell, S.C., Kathy Byrne, James T. Newman, Kevin J. Conway (argued), Cooney & Conway, Terrence M. Johnson, Chicago, Ill., for plaintiff-appellee.
 Andrew J. Boling, Daniel J. Cheely, Paul B. O'Flaherty, Jr., John Krivicich, Baker & McKenzie, Barbara E. Hermansen (argued), Catherine Masters Epstein, Sam V. Menegas, Robert H. Riley, Paul A. Scrudato, Ann Rae Heitland, Schiff, Hardin & Waite, Chicago, Ill., for defendants-appellants in No. 91-2108.
 M. Jayne Rizzo, Carolyn Quinn, John Dames (argued), Julian Solotorovsky, David B. Sudzus, Kelley, Drye & Warren, Chicago, Ill., for defendant-appellant in No. 91-2109.
 Before WOOD, Jr.,* and COFFEY, Circuit Judges, and CURRAN, District Judge.**
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 This negligence action against manufacturers of asbestos insulation products raises challenging questions regarding cause in fact and comparative fault. And in particular contention in this regard are two issues: whether there is sufficient evidence that each of the defendant's asbestos products were the cause in fact of the injured party's disease, and whether the court should have admitted evidence of the injured party's exposure to other products for purposes of demonstrating cause in fact or for purposes of demonstrating comparative fault. The question whether exposure to other products was admissible to show comparative fault is contingent on whether this case qualifies for a comparative fault analysis under Ill.Rev.Stat., ch. 110, p 2-1117. To decide this we must decide, as a matter of first impression, whether the release of large amounts of asbestos into the internal, workplace environment excludes this case from a comparative fault analysis under Ill.Rev.Stat., ch. 110, p 2-1118.
 
 I.
 
 2
 This appeal is based upon a negligence action originally filed by Henry and Grace Tragarz in 1988, shortly after Henry Tragarz was diagnosed as suffering from malignant pleural mesothelioma, a cancer that is extremely rare among the general population but not as rare among those occupationally exposed to asbestos fibers. Expert testimony in this case indicated that as many as seventy to eighty percent of mesothelioma cases are caused by the inhalation of asbestos. The plaintiffs alleged in this action that Henry Tragarz's disease was caused by his exposure to asbestos during his career as a sheet metal worker. Henry Tragarz died as a result of this disease on June 28, 1989, at age sixty-one. His widow, Grace Tragarz, was appointed special administrator, and the suit was amended to reflect wrongful death and survival claims.
 
 
 3
 Twenty-five defendants were originally named in the lawsuit. On August 2, 1989, the trial court granted defendants leave to file third-party complaints. Defendant Owens-Corning Fiberglas immediately filed a third-party complaint against the Manville Asbestos Disease Compensation Fund, and defendant Flintkote filed a cross-claim the following April. No other cross-claims or third-party complaints were filed.
 
 
 4
 Defendants American Energy, H.K. Porter, Asbestospray, and H & A Construction were voluntarily dismissed. Summary judgment was entered in favor of defendants Owens-Illinois, AC & S, Armstrong, Dana, GAF, National Gypsum, TAF Ltd., T & N Ltd., and T & N P/C on the basis of insufficient evidence of Mr. Tragarz's exposure to their products. Defendants Fibreboard, Eagle Picher, Flintkote, Garlock, Babcock & Wilcox, W.R. Grace, and Combustion Engineering settled. Defendants Celotex and Raymark sought bankruptcy. Manville was severed from the action shortly before trial. As such, the only defendants remaining at the time of trial were Keene Corporation ("Keene") and Owens-Corning Fiberglas Corporation ("OCF"). Both defendants denied liability, denied that Mr. Tragarz had been exposed to their products, denied that he had mesothelioma, and denied that there was any link between Mr. Tragarz's exposure to asbestos and his death.
 
 
 5
 The plaintiff put on evidence with regard to Mr. Tragarz's injuries, the family's loss as a result of his death, the defendants' knowledge of the dangers of asbestos, and the defendants' failure to notify Mr. Tragarz of these known dangers. However, we will summarize only the evidence relevant to the issues discussed in this opinion.
 
 
 6
 As we have already indicated, Mr. Tragarz was a sheet metal worker. As a sheet metal worker, Mr. Tragarz installed commercial duct work, blow pipe, and fans for heat ventilation or air conditioning. The testimony at trial indicated that as a sheet metal worker Mr. Tragarz often worked alongside insulators and pipefitters who installed and cut asbestos containing products. Moreover, Mr. Tragarz's deposition testimony indicates that on occasion Mr. Tragarz installed asbestos containing insulation.
 
 
 7
 The evidence presented to the jury on the issue of Mr. Tragarz's exposure to the defendants' products consisted of Mr. Tragarz's own deposition testimony; the live testimony of his usual partner, Frank Batka; a co-worker, Ed Severa; and an insulation worker, Mike Lavin, who worked at the Chicago Civic Center construction site.
 
 
 8
 Mr. Tragarz identified several job sites (Illinois Masonic Hospital, Witco Chemical, DePaul University, and the Chicago Civic Center) at which pipefitters or insulation workers using asbestos products were present. Mr. Tragarz specifically testified that he remembered seeing Kaylo, an OCF asbestos insulation product, while working as a sheet metal worker. Indeed, Mr. Tragarz testified that he remembered working on projects where pipefitters would be working ahead of him and the other sheet metal workers. He recalled the pipefitters taking asbestos pipecovering out of a Kaylo box and putting it around the pipes. He also remembers cutting this Kaylo pipecovering on occasion. Mr. Tragarz could not remember any specific job sites where he cut Kaylo, but he did remember cutting Kaylo "off and on, all over."
 
 
 9
 Frank Batka testified that he worked with Mr. Tragarz about ninety percent of the time over a period of twenty years. Mr. Batka indicated that insulators were also working at the majority of the jobs from the mid-1960s through the early 1970s. Mr. Batka identified a photograph of Kaylo as a product used within six to eight feet of Mr. Tragarz. Mr. Batka further testified that he could see the dust from Kaylo land on Mr. Tragarz. Mr. Batka, however, could not remember any specific job sites where he saw insulators install Kaylo products. Nonetheless, Mr. Batka did say that he saw insulators use Kaylo products in the mid-1960s through the mid-1970s. Although Mr. Batka said it would be difficult to approximate how many times he saw Kaylo on the sites during this nearly ten-year period, when asked if he saw Kaylo more than once, Mr. Batka responded, "Oh yes, more than one, yes."
 
 
 10
 Mr. Batka also identified Thermasil asbestos block, a product manufactured by Baldwin-Ehret-Hill, a predecessor company of Keene. Mr. Batka again said that this product was used within six to eight feet of Mr. Tragarz and that it created dust when it was cut and applied. Mr. Batka testified that he saw this product on sites in the early 1960s through the early 1970s. Mr. Batka also testified that on a few occasions he and Mr. Tragarz would cut and apply the product themselves. Mr. Batka did not testify as to how often or at which sites workers were dealing with Thermasil.
 
 
 11
 Edward Severa, who worked with Mr. Tragarz in the 1960s and early 1970s, also testified at trial. Mr. Severa indicated that he worked off and on with Mr. Tragarz for a period of about twenty years. Mr. Severa named three specific sites where he, Mr. Tragarz, and insulation workers all worked together. In describing these jobs, Mr. Severa indicated that the sheet metal workers and the insulation workers worked side-by-side. Mr. Severa stated that the insulation workers were above, below, and next to the sheet metal workers. And Mr. Severa testified that the insulation workers would cut the asbestos causing dust. He said this asbestos dust got on himself and Mr. Tragarz.
 
 
 12
 Although Mr. Severa identified three sites where he worked with Mr. Tragarz and insulation workers, Mr. Severa could not remember which insulation products were used at these sites. Mr. Severa did testify, however, that he and Mr. Tragarz worked on sites together with insulators who were cutting and installing Kaylo. Moreover, Mr. Severa testified that dust from Kaylo landed on Mr. Tragarz. Mr. Severa could not name specific sites where this occurred, but he did state that he saw Kaylo at the majority of sites he worked at from about the mid-1960s onward.
 
 
 13
 Mr. Lavin, an insulator, also testified at trial. Mr. Lavin described how the insulators sawed, chiseled, gouged, and installed asbestos insulation, and he explained that these activities caused substantial amounts of asbestos dust to be released into the air. Mr. Lavin testified that most of the insulation work was done in the ceiling around the ducts and pipes. And he testified that the asbestos dust created from the insulation activities would stay in the air for some period of time and eventually most of it would land on the floor. Once on the floor, the laborers would sweep up the dust causing it to reenter the air.
 
 
 14
 Mr. Lavin testified that the sheet metal workers worked alongside the insulators. On cross-examination Mr. Lavin stated that the sheet metal workers were in one of the three trades that the insulators "were around almost all the time." Mr. Lavin indicated that the insulators created substantial amounts of dust at the Chicago Civic Center exposing everyone at the site. Mr. Lavin indicated that this dust problem was so bad that the other workers complained because the insulators were creating all the dust at the site. Mr. Lavin's testimony also indicates that the dust problem was amplified by the fact that other workers would use air hoses to clean the asbestos off the floor in their work areas causing the asbestos dust to reenter the air. And finally, Mr. Lavin testified that he saw asbestos dust on the sheet metal workers' blue overalls.
 
 
 15
 Mr. Lavin was at the Civic Center site with fifty or sixty other insulators for "many, many months" in 1965. Mr. Lavin said that during this period there were very few floors in this thirty-odd floor complex that he did not work on, and again on cross-examination he said he worked on almost every floor. Mr. Lavin testified that he worked with and saw both Thermasil and Kaylo at the Civic Center, and he then confirmed this on re-direct when indicating that these products were throughout the Civic Center.
 
 
 16
 Mr. Tragarz indicated during his deposition that he did duct work at the Civic Center for one-and-one-half years. Mr. Tragarz indicated that he did not work any other jobs during this period and that he worked about forty-hour work weeks while at the Civic Center with some overtime and some days off. He said that he was working in a four- to five-man crew while at the Civic Center and that he was there with about twenty other crews. Mr. Tragarz did not work on every one of the thirty-odd floors, rather different work crews worked on different floors. Yet, Mr. Tragarz had a difficult time remembering the time period in which he worked at the Civic Center. Although uncertain as to the time period, Mr. Tragarz did state that he was working for H.G. Prizant when at the Civic Center, and Mr. Tragarz's social security records indicate that he worked for H.G. Prizant off and on from October 1963 through June 1965, including January to March and April to June of 1965.
 
 
 17
 Plaintiff's medical witnesses consisted of three of Mr. Tragarz's treating physicians and an expert pathologist. In May of 1988 the Tragarz family practitioner, Dr. George Lagorio, M.D., diagnosed Mr. Tragarz as having mesothelioma. Dr. Lagorio stated that it was his professional opinion that there was a causal relationship between mesothelioma and Mr. Tragarz's history of asbestos exposure.
 
 
 18
 Dr. Shelby Rifkin, Mr. Tragarz's oncologist, also agreed that Mr. Tragarz suffered from mesothelioma. Dr. Rifkin's opinion was that Mr. Tragarz's mesothelioma was caused by his asbestos exposure. And Dr. Rifkin indicated that in his professional opinion it does not take a great deal of exposure to asbestos to induce mesothelioma, an opinion shared by Dr. McCaughey, the Occupational Safety and Hazards Administration ("OSHA"), and the Environmental Protection Agency ("EPA").
 
 
 19
 Dr. Yana, M.D., is a board-certified pathologist who also diagnosed malignant mesothelioma. Moreover, Dr. Yana performed an autopsy on Mr. Tragarz. During this procedure Dr. Yana found asbestos in the lung tissue.
 
 
 20
 Plaintiff's expert pathologist, W.T. Elliot McCaughey, testified by a videotaped deposition. Dr. McCaughey is a former director of the Canada Tumor Reference Centre, a member of the United States-Canada Mesothelioma Panel, and a professor of pathology. Dr. McCaughey described his examination of Mr. Tragarz's tissue samples and gave an unequivocal diagnosis of mesothelioma.
 
 
 21
 Dr. McCaughey was of the opinion that Mr. Tragarz's asbestos exposure caused his mesothelioma. And Dr. McCaughey explained that each exposure to asbestos contributes to the disease to the extent that the exposure increases the dose. Moreover, Dr. McCaughey testified about various studies indicating that mesothelioma can result from low-level exposures. One such study indicated that workers at an asbestos company received mesothelioma from as little as three- to six-months exposure. Dr. McCaughey also testified that there is no level of exposure to asbestos of any fiber type at which there is no risk of getting mesothelioma.
 
 
 22
 The plaintiff also introduced the preamble to OSHA regulations into evidence. This material set forth in the preamble indicates that mesothelioma results from low-level, non-intense exposures. Indeed, this material cites one study in which four cases of mesothelioma were diagnosed among 626 family members of amosite factory workers, indicating that these family members received their exposure from asbestos dust carried home on the workers' clothing. 51 Fed.Reg. 22619 (June 20, 1986). And this material indicates that there is an exceptionally strong relationship between asbestos exposure and an excess risk of mesothelioma among workers with low cumulative exposures to asbestos. 51 Fed.Reg. 22620 (June 20, 1986).
 
 
 23
 The plaintiff also introduced into evidence the preamble to Environmental Protection Agency regulations. This introductory material indicates that once released asbestos fibers have a number of characteristics that tend to increase human exposure, including the fact that they are "extremely durable and possess aerodynamic properties that allow them to remain suspended in the air for a long time and to reenter the air readily after settling out." 54 Fed.Reg. 29472 (July 12, 1989). This means that asbestos "can persist for a very long time in the environment and can travel extended distances through the air." Id. "These factors increase the intensity, duration, and areas of exposure and complicate attempts to control or reduce exposure." Id.
 
 
 24
 After hearing this and other evidence, the jury returned a verdict in favor of the plaintiff and assessed damages of $3,000,000. OCF and Keene made motions for j.n.o.v., and in the alternative for a new trial. The district court denied these motions. OCF and Keene then filed timely notices of appeal to this court.
 
 
 25
 The focal point of the defendants' claims of error pertain to causation, joint and several liability, and to whether the court should have admitted evidence of Mr. Tragarz's exposure to other products with regard to these issues. The defendants have also raised numerous other claims of error, only some of which warrant discussion. We affirm the plaintiff's judgment for joint and several liability against OCF and Keene, but remand for further proceedings between OCF and Keene with regard to the issue of contribution.
 
 II.
 
 26
 The parties are before this court based on diversity of citizenship jurisdiction. The parties agree that Illinois law governs this diversity case. This court, as is customary, will interpret questions of state law de novo. See Salve Regina College v. Russell, --- U.S. ----, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).
 
 
 27
 A. Sufficiency of the Evidence Regarding Cause in Fact
 
 
 28
 We first address the question of whether the district court erred in denying defendants' motion for a j.n.o.v. The defendants argue that j.n.o.v. was warranted because the plaintiff failed to put forth sufficient evidence of cause in fact. In order to warrant a j.n.o.v. under Illinois law the evidence when viewed in the light most favorable to the non-moving party must so overwhelmingly favor the moving party that no contrary verdict could stand. Pedrick v. Peoria & Eastern R.R. Co., 37 Ill.2d 494, 229 N.E.2d 504, 513-14 (1967). See also Fort Howard Paper Co. v. Standard Havens, Inc., 901 F.2d 1373, 1382 (7th Cir.1990) (state law governs standard for review of denial of j.n.o.v. in diversity cases). We review this question of law de novo.
 
 
 29
 In this negligence action plaintiff had the burden to prove by a preponderance of the evidence that Keene and OCF caused Mr. Tragarz harm or injury. Smith v. Eli Lilly & Co., 137 Ill.2d 222, 148 Ill.Dec. 22, 26, 560 N.E.2d 324, 328 (1990). The plaintiff's case was based on a negligence theory. Under this theory plaintiff alleged that the exposure to the defendants' asbestos containing products caused Mr. Tragarz's fatal disease of mesothelioma. In order to sustain such a claim, the plaintiff had to adequately show that exposure to defendants' asbestos products caused Mr. Tragarz's disease. Defendants seem to suggest that the plaintiff failed to adequately demonstrate that asbestos caused Mr. Tragarz's mesothelioma. However, considering that the record is replete with evidence that Mr. Tragarz was sometimes covered with asbestos dust during his work as a sheet metal worker, considering that the record indicates that mesothelioma is extremely rare among persons not exposed to asbestos, and considering that several doctors testified that it was their professional opinion that Mr. Tragarz's disease was caused by his past asbestos exposure, we are not persuaded by defendants' argument. A closer question, however, is whether plaintiff submitted sufficient evidence that the defendants' asbestos products were a cause in fact of Mr. Tragarz's mesothelioma.
 
 
 30
 In a products liability action, whether based on strict liability or negligence, the plaintiff must identify the manufacturer of the product and demonstrate a causal relationship between the injury and the manufacturer's product. See Zimmer v. Celotex Corp., 192 Ill.App.3d 1088, 140 Ill.Dec. 230, 232, 549 N.E.2d 881, 883 (1989). This causal relationship can be proved by circumstantial evidence. Yet in order to get to the jury, the plaintiff must demonstrate more than a speculative relationship between the product and the injury. Id. This means that a plaintiff must show more than a mere possibility that the product caused the injury. Rather, the plaintiff must present evidence justifying an inference of probability. Id. In an asbestos case this means that the plaintiff must put forth evidence that supports an inference of probable exposure to the defendant's asbestos product.
 
 
 31
 Zimmer, like this case, involved a suit based on a worker's exposure to asbestos-containing products. In that case the Appellate Court of Illinois held that in order to support an inference of probable exposure the plaintiff must present evidence that "a particular defendant's product was used at the job site and that the plaintiff was in proximity to that product at the time it was being used." Id., 140 Ill.Dec. at 233, 549 N.E.2d at 884. Evidence of such exposure can come in several forms. First, the injured party can testify that he or she worked with or in proximity to the defendant's asbestos containing products or the plaintiff can put forth evidence that coworkers saw the plaintiff working with or around the defendant's asbestos products. In addition to such direct evidence, the plaintiff can rely on circumstantial evidence that the plaintiff worked in proximity to someone who remembers using the defendant's product. Schultz v. Keene Corp., 729 F.Supp. 609, 613 (N.D.Ill.1990) (a diversity case applying Illinois law).
 
 1. Sufficiency of Evidence against OCF
 
 32
 The plaintiff put on all three types of evidence in its case against OCF. Indeed, with respect to OCF's Kaylo asbestos products, the plaintiff put forth Mr. Tragarz's direct testimony that he himself cut Kaylo asbestos products and that he worked near insulators and pipefitters using such products. The plaintiff also put forth Mr. Batka's direct testimony that Mr. Tragarz worked within six to eight feet of insulators who installed and cut Kaylo and Mr. Severa's direct testimony that Mr. Tragarz worked alongside insulators and pipefitters who were installing and cutting Kaylo. And each of these witnesses testified that when working alongside insulators and pipefitters using Kaylo products asbestos dust would get on the sheet metal workers, including Mr. Tragarz. OCF argues that these direct statements with regard to Mr. Tragarz's exposure are insufficient to support a jury verdict because none of the testifying parties could list a specific job site at which Mr. Tragarz was exposed to Kaylo.
 
 
 33
 According to OCF and Keene, a plaintiff must link the exposure to a specific job site in order support a jury verdict of probable exposure. We do not agree with such an interpretation of Illinois law. In fact, neither OCF nor Keene have cited a single Illinois case that has held that direct evidence that the injured person worked with or in close proximity to the defendant's asbestos containing product is insufficient to support a finding of probable exposure unless the testifying witness can remember a particular site in which the exposure occurred. Granted, when a plaintiff relies exclusively on circumstantial evidence that asbestos was used at a particular site, the failure to adequately place the plaintiff at that site could be fatal to the plaintiff's claim. This is because without such evidence there would often be no proof of proximity and no proof of probable exposure. See, e.g., Zimmer, 140 Ill.Dec. at 232-33, 549 N.E.2d at 883-84; Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1164 (4th Cir.1986) (testimony that products were at an apparently large shipyard between 1960 and 1970 at which time the plaintiff worked at the shipyard, standing alone, was not enough under Maryland law to get to the jury on the issue of probable exposure to these products). But when the plaintiff puts forth direct testimony that he or she was exposed to the defendant's product, the testimony itself is evidence of proximity, and the failure to remember specific sites in which such an exposure occurred goes to the issue of credibility--an issue ordinarily within the province of the jury.
 
 
 34
 Although it is not absolutely necessary for a witness providing direct testimony of exposure to recite the specific location of this exposure, the Illinois courts might require something more than an isolated, vague statement that the plaintiff worked around the defendant's product to support a jury verdict on the issue of exposure. See Schultz, 729 F.Supp. at 614. The plaintiff's case against OCF, however, does not consist of an isolated, vague statement that Mr. Tragarz worked with Kaylo. Rather, the direct evidence consists of the somewhat detailed testimony of three separate witnesses. For example, Mr. Tragarz not only testified that he remembered working around Kaylo, but he testified that he remembered seeing pipefitters working ahead of him pulling Kaylo asbestos products out of the Kaylo box and then installing this product. Moreover, Mr. Tragarz recalled cutting Kaylo pipecovering himself. And, although not remembering specific sites in which he cut Kaylo, he did remember working with and cutting Kaylo "off and on, all over." In addition, Mr. Batka who worked with Mr. Tragarz for almost twenty years testified that he specifically remembered Kaylo because its name reminded him of a chocolate soda that was on the market in the 1960s. Furthermore, Mr. Batka testified that Mr. Tragarz was exposed to Kaylo asbestos products on more than one occasion. And Mr. Severa, who worked alongside Mr. Tragarz off and on in the 1960s and early 1970s, testified that he worked on sites with Mr. Tragarz where the insulators were installing and cutting Kaylo asbestos products. Indeed, Mr. Severa indicated that he was very familiar with Kaylo because it was on the majority of sites he worked from the mid-1960s onward.
 
 
 35
 This direct evidence appears sufficient in itself to support a finding of probable exposure. Nonetheless, this direct evidence is not the entirety of the plaintiff's case against OCF. Rather, the plaintiff also put on circumstantial evidence of exposure through Mr. Batka's and Mr. Lavin's testimony. For example, Mr. Batka testified that he worked along with Mr. Tragarz over ninety percent of the time over twenty years and that he remembered working alongside insulators and pipefitters who were cutting and installing Kaylo asbestos containing products. Again, we cannot say that Mr. Batka's somewhat detailed testimony with regard to his exposure to Kaylo lacks any probative value because he cannot remember the specific sites at which this exposure occurred. Granted, circumstantial evidence that Mr. Batka worked with Kaylo is only probative if there is evidence that Mr. Tragarz was near Mr. Batka at the times when Mr. Batka worked with Kaylo. However, in light of the great frequency and regularity that Mr. Tragarz and Mr. Batka worked together--about ninety percent of the time over twenty years--it was reasonable for the jury to infer if Mr. Batka was exposed to Kaylo, Mr. Tragarz was likewise exposed to Kaylo. And finally, Mr. Lavin testified that he saw Kaylo throughout the Chicago Civic Center site when working there for "many, many, months" in 1965--Mr. Tragarz worked next to insulators at this site from 1963 through June of 1965.
 
 
 36
 OCF points to the flaws with regard to each of the above pieces of evidence in arguing that such evidence does not support the jury verdict. However, we do not view evidence in isolation when reviewing whether such evidence is sufficient to support a jury verdict. Rather, we look to the cumulative effect of the evidence as a whole, and when looking to the above evidence in its entirety we conclude that it is sufficient to support an inference of probable exposure to Kaylo asbestos products.
 
 
 37
 Putting forth evidence supporting an inference of probable exposure to a defendant's asbestos products, however, may not be sufficient to demonstrate that the exposure to a defendant's products was a cause in fact of the plaintiff's asbestos-induced illness. This is because in order to demonstrate cause in fact under Illinois law, the plaintiff must demonstrate that the exposure to the defendant's asbestos products was a substantial factor in causing the injured party's disease. Turner v. Roesner, 193 Ill.App.3d 482, 140 Ill.Dec. 415, 420, 549 N.E.2d 1287, 1292 (1990), appeal denied, 132 Ill.2d 555, 144 Ill.Dec. 267, 555 N.E.2d 386 (1990).
 
 
 38
 The defendants note that under Illinois law the courts look to the frequency, regularity, and proximity of exposure in determining whether the injured party's exposure to defendants' asbestos products was a substantial factor in causing the alleged injury. Wehmeier v. UNR Industries, Inc., 213 Ill.App.3d 6, 157 Ill.Dec. 251, 268, 572 N.E.2d 320, 337 (1991); Thacker v. UNR Indus., Inc., 213 Ill.App.3d 38, 157 Ill.Dec. 272, 274-75, 572 N.E.2d 341, 343-44 (1991). See also Lohrmann, 782 F.2d at 1163. However, as the Appellate Court of Illinois made clear in its recent decisions in Wehmeier and Thacker this so-called, frequency, regularity, and proximity test is not a rigid test with an absolute threshold level necessary to support a jury verdict. For example in Wehmeier, although adopting the frequency, regularity, and proximity test, the court held that at least the proximity prong can be satisfied by presenting evidence that asbestos remains in the air for long periods and drifts extended distances and that plaintiff was in the reach of this drift, and the court indicated that the frequency and regularity prongs become less cumbersome when dealing with cases involving diseases, like mesothelioma, which can develop after only minor exposures to asbestos fibers. Wehmeier, 157 Ill.Dec. at 268, 572 N.E.2d at 337; see also Thacker, 157 Ill.Dec. at 274-75, 572 N.E.2d at 343-44.
 
 
 39
 Moreover, it appears that this test has somewhat diminished importance when a plaintiff relies on direct evidence of exposure as opposed to circumstantial evidence. That is, many of the decisions that have dismissed cases based on the failure to adequately demonstrate frequency, regularity, and proximity, whether or not specifically mentioning this test, have been cases in which the plaintiff attempted to prove exposure through circumstantial evidence that an asbestos product was at a particular place over a particular time and that the injured party was at or near that place at that time. See, e.g., Zimmer, 140 Ill.Dec. at 232, 549 N.E.2d at 883; Lohrmann, 782 F.2d at 1164 (failure to show anymore than the fact that two of the defendants' products were at the same shipyard sometime during a ten-year period in which the plaintiff was at the shipyard). In such cases the failure to put on evidence that the injured party was around the defendant's product with any regularity or frequency constituted a failure to prove probable exposure. For example, in Zimmer the plaintiff put forth circumstantial evidence that he worked in several shipyards over a nearly fifteen-year period. One of these shipyards covered two square miles and employed about 55,000 people. Zimmer, 140 Ill.Dec. at 232, 549 N.E.2d at 883. Moreover, the plaintiff worked on hundreds of ships during this time period. Plaintiff's only evidence of probable exposure, to all but Johns-Manville Sales Corporation's products, was affidavits of various workers who remembered seeing various defendants' asbestos products on different ships that plaintiff worked on sometime in this fifteen-year period. Yet, there was no evidence with regard to the time in which the plaintiff worked on any one of these ships nor was there evidence indicating the time in which the witnesses saw defendants' products on these numerous ships. Id. at 231-33, 549 N.E.2d at 883-84. This meant that the plaintiff failed to put forth evidence placing himself anywhere near the defendants' products. In such a situation, the failure to show that he was in proximity to the defendants' products with any regularity or frequency, meant that the plaintiff failed to sustain his burden of demonstrating probable exposure, and therefore summary judgment was warranted. Id. at 233, 549 N.E.2d at 884.
 
 
 40
 In sum, many of the decisions applying the frequency, regularity, and proximity test focused on the question of whether the plaintiff supported an inference of probable exposure rather than focusing on the question that we must now address: whether the plaintiff although proving probable exposure succeeded in showing that the exposure was a substantial factor in the resulting disease. See Schultz, 729 F.Supp. at 613-15 (the failure to present evidence of proximity was fatal when relying on circumstantial evidence to prove exposure to Unisbestos, but once showed probable exposure to Kaylo, the fact that there was no evidence of regular or frequent exposure did not mean that the plaintiff failed to show that Kaylo was a substantial factor in causing the disease). This does not mean, however, that the frequency, regularity, and proximity test is irrelevant when determining whether the plaintiff has proved that the exposure to defendant's product was a substantial factor in causing the resulting disease. Rather, this simply means that these factors become somewhat less critical when a party puts forth direct evidence of exposure to a defendant's products.
 
 
 41
 Not only is the so-called frequency, regularity, and proximity test less vital in cases involving direct evidence, but as we have already indicated the Appellate Court of Illinois also emphasized in Wehmeier that the frequency, regularity, and proximity test becomes even less rigid for purposes of proving substantial factor when dealing with cases in which exposure to asbestos causes mesothelioma. The Wehmeier court indicated that the reason for this diminished importance is that mesothelioma can result from minor exposures to asbestos products--a fact made evident by the medical testimony, OSHA regulations, and EPA regulations that are part of the record in this case. See Wehmeier, 157 Ill.Dec. at 268, 572 N.E.2d at 337. And in emphasizing this point, the Wehmeier court stated, "the substantial factor test is not concerned with the quantity of the injury-producing agent or force but rather with its legal significance." Id. And the court stated, "Where there is competent evidence that one or a de minimis number of asbestos fibers can cause injury, a jury may conclude the fibers were a substantial factor in causing a plaintiff's injury." Id.
 
 
 42
 In this case there is ample medical testimony and other evidence indicating that even a minimal exposure to asbestos can induce or contribute to the development of mesothelioma. Indeed, the OSHA regulations and Dr. McCaughey's testimony indicate that there is no level of asbestos exposure at which a person is safe from contracting mesothelioma.
 
 
 43
 The record not only contains ample evidence that low exposures of asbestos induce and contribute to the development of mesothelioma, but there is also evidence that Mr. Tragarz, on more than one occasion, worked next to insulators who were cutting, gouging, and installing Kaylo asbestos, and there is evidence that on more than one occasion Mr. Tragarz cut Kaylo asbestos himself. Moreover, the record is also replete with evidence with regard to the substantial amounts of dust that covered sheet metal workers, like Mr. Tragarz, who worked alongside insulators and pipefitters who were cutting, gouging, and installing asbestos insulation. All this indicates that whatever the frequency or regularity of Mr. Tragarz's exposure to Kaylo products, these exposures were intense.
 
 
 44
 Considering the above evidence, we do not agree with OCF's argument that the plaintiff failed to put forth sufficient evidence that Kaylo was a substantial factor in causing Mr. Tragarz to develop mesothelioma.[1]
 
 
 45
 2. Sufficiency of the Evidence against Keene
 
 
 46
 Now we move to a discussion of whether the evidence was sufficient to demonstrate probable exposure to Keene's predecessor's Thermasil asbestos products, and whether the evidence was sufficient to support a finding that Thermasil was a substantial factor in causing Mr. Tragarz's mesothelioma. The case against Keene is a closer case than that against OCF.
 
 
 47
 Mr. Tragarz did not specifically remember working with a product named Thermasil, he only remembered seeing the Keene name on insulation products. Considering that another company had an asbestos product named Keene, it is not clear whether Mr. Tragarz remembered this other company's product or if he remembered seeing the Keene Corporation name.
 
 
 48
 Mr. Batka, on the other hand, specifically remembered Thermasil. And he gave sufficiently detailed testimony regarding his and Mr. Tragarz's exposure to Thermasil. Mr. Batka testified that he saw Mr. Tragarz work within six to eight feet of insulators using Thermasil. He indicated that he saw Thermasil on sites between the early 1960s through the early 1970s. Moreover, Mr. Batka testified he and Mr. Tragarz not only worked around persons installing Thermasil asbestos products, but they both cut Thermasil asbestos products themselves. And Mr. Batka indicated that asbestos dust from Thermasil got on him and Mr. Tragarz. Just like the case against OCF, Mr. Batka's testimony not only serves as direct, eye-witness testimony of Mr. Tragarz's exposure to Thermasil, but it also serves as circumstantial evidence that because Mr. Batka worked with Mr. Tragarz ninety percent of the time over a period of twenty years, if Mr. Batka was exposed to Thermasil, it is probable that Mr. Tragarz was also exposed to Thermasil.
 
 
 49
 We also have the testimony of Mr. Lavin. Mr. Lavin testified that he saw Thermasil at the Chicago Civic Center while working there for "many, many months" in 1965. The record indicates that Mr. Tragarz, while working for H.G. Prizant, worked forty-hour weeks at the Civic Center from 1963 through June of 1965. Granted, this center is a thirty-plus story building in which Mr. Tragarz apparently only worked a few floors. Yet, Mr. Lavin who was on almost every floor indicated that Thermasil was throughout the building. Moreover, Mr. Lavin testified that he saw some boxes of Thermasil covered with a few inches of dust while at the Civic Center, indicating that these boxes had been around for awhile and that Thermasil was at the site even before Mr. Lavin arrived.
 
 
 50
 Keene argues, however, that Mr. Lavin's testimony and Mr. Tragarz's work records fail to sufficiently establish that Mr. Tragarz was in the vicinity of insulation workers using Thermasil with any regularity or frequency. This argument has some merit because it is not entirely clear that Mr. Lavin's indication that Thermasil was throughout the building was sufficient to demonstrate that insulators on the few floors in which Mr. Tragarz worked used Thermasil. Nonetheless, there is some evidence in the record indicating that Mr. Tragarz might have been exposed to Thermasil even if he was not working directly alongside insulators using Thermasil. For example, Mr. Lavin testified that the insulators created a substantial amount of asbestos dust that got on everyone at the site. Moreover, he testified that this dust would remain in the air for long periods of time and then this dust would reenter the air when the sweepers and air blowers were used to clean the floors of dust. This along with the evidence that asbestos can stay suspended in the air for long periods of time and drift extended distances offer some support for an inference that Mr. Tragarz was exposed to Thermasil while at the Civic Center.
 
 
 51
 Admittedly, it is not entirely clear whether this evidence with regard to Mr. Tragarz's potential exposure to asbestos at the Chicago Civic Center, standing alone, would be sufficient to support a finding of cause in fact. However, when we also consider Mr. Batka's sufficiently detailed testimony, there is sufficient evidence of probable exposure. And when we consider the medical evidence that minimal dosages of asbestos can contribute to mesothelioma, the aerodynamic qualities of asbestos which make it remain in the air for an extended period of time, the substantial amounts of asbestos dust that result from an insulator's work, and the fact that Mr. Tragarz worked alongside these insulators, we conclude that the evidence supports a verdict that Thermasil was a substantial factor in causing Mr. Tragarz to develop mesothelioma.
 
 
 52
 B. Jury Instructions Regarding Proximate Cause
 
 
 53
 This, however, is not the end of Keene's causation argument. That is, Keene argues that even if the evidence presented on the issue of causation was sufficient to avoid a j.n.o.v., the instructions given on the issue of proximate cause failed to adequately apprise the jury of the law. And Keene argues that this failure rose to the level of reversible error.
 
 
 54
 Proximate cause embodies both the concept of cause in fact and legal cause. Keene first argues that the proximate cause instruction given was an inaccurate statement of the law. The problem with this argument, however, is that the district court gave the Illinois Pattern Instructions (I.P.I.) for proximate cause. We can generally assume that I.P.I. instructions correctly instruct the jury on a term so common and fundamental as proximate cause. However, in some instances the I.P.I. instructions alone might be inadequate. See Lay v. Knapp, 93 Ill.App.3d 855, 49 Ill.Dec. 272, 274, 417 N.E.2d 1099, 1101 (1981).
 
 
 55
 The I.P.I. instructions given on proximate cause in this case read as follows:
 
 
 56
 If you decide that the defendants were negligent and that this negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury.
 
 
 57
 More than one person may be to blame for causing an injury. If you decide that the defendants were negligent and that this negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.
 
 
 58
 When I use the expression "proximate cause", I mean that cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes injury.
 
 
 59
 Keene argues that the above I.P.I. instructions are inadequate because they fail to adequately apprise the jury that to satisfy the cause in fact prong of proximate cause the plaintiff must demonstrate that the defendant's actions were a substantial factor in causing the plaintiff's injuries. In response to this argument, we first note that proximate cause is a fundamental and frequently used concept in negligence law, and it is reasonable for a district court to assume that in most cases the I.P.I. instructions adequately instruct on this issue. This means that while this court might agree that an instruction with regard to the substantial factor test would be helpful to a jury, we will assume that the I.P.I. instructions adequately lay out law in most cases.
 
 
 60
 In any event, even if an instruction regarding the substantial factor test would have been helpful, Keene's proffered instruction was not appropriate. The proffered instruction ("Instruction 18") pertaining to the substantial factor issue reads as follows:
 
 
 61
 In considering whether a product of any of the defendants was a proximate cause of the injury to the plaintiff's decedent, you should consider the particular properties of each of the defendant's products; the extent of the plaintiff's exposure to that particular product and whether that exposure was a substantial factor in causing the plaintiff's present condition.
 
 
 62
 In describing what the jury should look to in determining cause, Instruction 18 specifically mentions that the jury should consider the extent of the exposure to each defendant's products. However, Instruction 18 fails to indicate that the jury could consider the nature of the illness, the medical testimony regarding the level of exposure necessary to induce the illness, and the aerodynamic qualities of asbestos when determining whether the exposure to defendant's products was a substantial factor. As such, this proffered instruction seems to overemphasize some considerations while ignoring others. National Tea Co. v. Commerce and Indus. Ins. Co., 119 Ill.App.3d 195, 74 Ill.Dec. 704, 713, 456 N.E.2d 206, 215 (1983) (should avoid unduly highlighting certain evidence in jury instructions). Therefore, the district court did not err in rejecting this instruction.
 
 
 63
 Keene further argues that the instructions given were inadequate because they failed to instruct the jury as to the frequency, regularity, and proximity test. Keene proffered the following instruction on this issue:
 
 
 64
 To establish exposure to a defendant's product, there must be evidence that the plaintiff's decedent was working at a particular job site at a definite time in close proximity to a defendant's product while that product was being used.
 
 
 65
 ("Instruction 20").
 
 
 66
 Evidence that a defendant's product was merely present at a work site where the plaintiff's decedent worked is insufficient to establish exposure to that product.
 
 
 67
 ("Instruction 21").
 
 
 68
 Considering the Illinois Appellate Court for the Fourth District's indication that the frequency, regularity, and proximity test is not a rigid test particularly in mesothelioma cases, the proffered instructions might have caused more confusion than they would have resolved. See Wehmeier, 157 Ill.Dec. at 268, 572 N.E.2d at 337. And the above instructions are not appropriate for several reasons. First, Instruction 20 indicates that evidence of exposure is never relevant unless there is evidence with regard to the particular job site at which this exposure occurred--an argument that we have already rejected. Second, Instruction 21 clouds the message in Thacker and Wehmeier: mere presence at a workplace might be sufficient evidence of cause in fact if accompanied with evidence regarding the aerodynamic qualities of asbestos and the propensity to contract mesothelioma upon minimal exposure.
 
 
 69
 For these reasons, we conclude that the district court did not err when giving I.P.I. instructions and rejecting the instructions proffered by Keene.
 
 
 70
 C. Evidence Regarding Exposure to Other Companies' Products
 
 
 71
 OCF and Keene also argue that the district court made other errors which warrant a new trial. First, they argue that the trial court erred when refusing to admit evidence of Mr. Tragarz's exposure to other asbestos products. OCF and Keene argue that the failure to admit this evidence constituted reversible error for two reasons: (1) the evidence was necessary for the jury to make an adequate assessment of cause in fact; and (2) this evidence should have been admitted so that the jury could have apportioned fault under Ill.Rev.Stat., ch. 110, p 2-1117.
 
 
 72
 1. Is Evidence Relevant to Cause in Fact Determination?
 
 
 73
 First we address whether the district court committed reversible error in failing to admit such evidence for purposes demonstrating cause in fact. That is, defendants argue that the jury could not assess whether OCF's and/or Keene's products were a substantial factor in contributing Mr. Tragarz's disease without evidence of Mr. Tragarz's exposure to other products.
 
 
 74
 This argument implies that the so-called, substantial factor test is a comparative test in which the jury assesses all contributing causes and determines which ones are substantial. This seems to misstate the nature of the substantial factor inquiry under Illinois law because the Illinois courts in applying the substantial factor test do not seem concerned with which of the many contributing causes are most substantial. Rather, they seem concerned with whether each contributing cause, standing alone, is a substantial factor in causing the alleged injury. We derive this interpretation from Illinois cases like Lipke v. Celotex Corporation, which emphasize that "there can be more than one proximate cause of an injury." 153 Ill.App.3d 498, 106 Ill.Dec. 422, 430, 505 N.E.2d 1213, 1221 (1987), appeal dismissed, 129 Ill.Dec. 387, 536 N.E.2d 71 (1989).
 
 
 75
 The Lipke case, like this case, involved a worker's personal liability suit against a manufacturer of asbestos insulation products. And in that case, like this case, the defense argued that the trial court erred when it refused to admit evidence of the plaintiff's exposure to other asbestos products. After indicating that there can be more than one proximate cause of an injury, the Lipke court rejected this argument. Id.
 
 
 76
 Moreover, a comparative approach to the substantial factor test has its problems. For example, suppose a plaintiff shows that the amount of exposure that it received from defendant A's asbestos product was alone sufficient to cause mesothelioma. If such a plaintiff was not exposed to any other products, the plaintiff would have sufficient evidence to support a finding that but for exposure to the defendant A's product the plaintiff would not have gotten ill. On the other hand, under OCF's and Keene's theory, if the plaintiff was exposed to numerous other asbestos products, the plaintiff might not be able to prove cause in fact in a suit against defendant A because the same exposure to defendant A's product might not be substantial in comparison to the exposure to the other products. Such a result does not promote the purposes of the substantial factor test, which is aimed at alleviating the inequities that result when applying the but-for test in a multi-defendant case, not at creating such inequities.
 
 
 77
 In sum, under our interpretation of Illinois law, the plaintiff's exposure to each defendant's product should be independently evaluated when determining if such an exposure was a substantial factor in causing the plaintiff's injury--meaning that evidence of an exposure to other manufacturer's products is not relevant to such an inquiry. As such, the district court properly excluded such evidence.
 
 
 78
 2. Is Evidence Admissible to Show Comparative Fault?
 
 
 79
 Now we come to the more difficult question of whether evidence of exposure to other products should have been admitted for purposes of showing comparative fault under Ill.Rev.Stat., ch. 110, pp 2-1117, 2-1118 ("Illinois's joint and several liability statute"). This statute, adopted in 1986, eliminates pure joint and several liability. Section 2-1117 of this statute provides:
 
 
 80
 Except as provided in Section 2-1118, in actions on account of bodily injury or death or physical damage to property, based on negligence or product liability based on strict tort liability, all defendants found liable are liable for plaintiff's past and future medical and medically related expenses. Any defendant whose fault, as determined by the trier of fact, is less than 25% of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendants who could have been sued by the plaintiff, shall be severally liable for all other damages.
 
 
 81
 Ill.Rev.Stat., ch. 110, p 1-2117.
 
 
 82
 If Section 2-1117 applies to this action, then the evidence of exposure to other manufacturer's products should have been admissible for purposes of demonstrating comparative fault. However, Section 2-1118 of this statute contains two exceptions to the operative language of Section 2-1117. The district court concluded that one of these exceptions applies to this case. This exception reads as follows:
 
 
 83
 Notwithstanding the provisions of Section 2-1117, in any action in which the trier of fact determines that the injury or damage for which recovery is sought was caused by an act involving the discharge into the environment of any pollutant, including any waste, hazardous substance, irritant or contaminant, including, but not limited to smoke, vapor, soot, fumes, acids, alkalis, asbestos, toxic or corrosive chemicals, radioactive waste or mine tailings, and including any such material intended to be recycled, reconditioned or reclaimed, any defendants found liable shall be jointly and severally liable for such damage.
 
 
 84
 Ill.Rev.Stat., ch. 110, p 2-1118 (emphasis added).
 
 
 85
 The plaintiff argues that the district court correctly concluded that this exception applies to this case because the release of substantial amounts of asbestos dust into the air during the cutting, gouging, and installing activities constituted a discharge of asbestos into the environment. And the plaintiff argues that this means that the defendants are jointly and severally liable for the full extent of the $3,000,000 award of damages, meaning that evidence of Mr. Tragarz's exposure was irrelevant to the damage issue. The defendants, on the other hand, argue that this exception does not apply because discharge into the environment means discharge into the external environment and not discharge into the environment internal to a building or workplace.
 
 
 86
 In sum, the plaintiff argues that the district court correctly interpreted and applied the discharge into the environment phrase while the defendants argue otherwise. None of the parties, however, have suggested that this question is one for the jury. That is, despite the fact that Section 2-1118 limits its application to cases "in which the trier of fact determines that the injury or damage for which recovery is sought was caused by an act involving the discharge into the environment of any pollutant, including ... asbestos," Ill.Rev.Stat., ch. 110, p 2-1118 (emphasis added), none of the parties argue that the question as to whether the discharge of asbestos constituted a discharge into the environment should have been submitted to the jury.
 
 
 87
 The parties have not pointed to any Illinois cases, nor have we found any, which interpret the meaning of the above-quoted language in Section 2-1118, let alone any cases which tell us whether or not the application of this provision is one for the jury. One reading of this provision is that both the determination of what caused the injury and whether the act causing the injury involved a discharge into the environment are questions for the trier of fact. This seems to be the most straightforward interpretation. However, there is another reasonable interpretation of this statute. Under this second interpretation the question for the trier of fact is what caused the injury and the question for the judge is whether this cause involved a discharge into the environment. Although the former reading seems to be the most straightforward, the latter seems more practical in that it leads to less complications.
 
 
 88
 The reason that the latter interpretation leads to less complications is that evidence regarding alternate contributing causes is irrelevant to the issue of cause in fact, but it is very relevant to the issue of comparative fault. In other words, under the first interpretation, the admissibility of a potentially large amount of evidence could hinge on whether the injury is caused by a discharge into the environment. This means that even if the discharge into the environment determination is one for the jury, the judge would need to make some initial determination as to whether the alleged tortious act involved a discharge into the environment in order to determine whether evidence of other contributing causes, like evidence of exposure to other companies' asbestos products, is admissible. But under the first interpretation the question whether the case involved a discharge into the environment would still be one for the jury. This means that if the judge admitted evidence of contributing causes but the jury found that the cause involved a discharge into the environment, then this extraneous, confusing, and time-consuming evidence would have been admitted for naught.
 
 
 89
 Such practical difficulties are largely alleviated under the second interpretation because under this interpretation only the issue of what caused the injury, and not whether this cause was related to discharge into the environment would go to the jury. It is not entirely clear whether it is better for a court faced with two reasonable interpretations to adopt the more straight forward or the more practical interpretation. Nonetheless, because the parties in this case did not raise the argument that this might be a jury question, we need not resolve this issue. Instead, we will assume, as did the parties, that the judge correctly treated as a question of law the question of whether this case involved a discharge into the environment under Section 2-1118.
 
 
 90
 This now brings us to the difficult question of whether the release of large amounts of asbestos dust into the internal surroundings of a building which is either fully constructed or under construction constitutes a discharge into the environment under Section 2-1118. As we have already indicated, we have found no Illinois precedent on this point.
 
 
 91
 The defendants point to primarily two lines of cases in arguing discharge into the environment means discharge into the outside environment, not discharge into the environment internal to a building. The defendants first point to cases interpreting similar language under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). For example, the defendants point to this court's decision in Covalt v. Carey Canada Inc., 860 F.2d 1434 (7th Cir.1988). In Covalt this court analyzed whether the accrual date for an action against asbestos manufacturers was dictated by the Superfund Amendment and Reauthorization Act of 1986 ("SARA"), an amendment to CERCLA, or whether the accrual date was dictated by Indiana law. Under the language of SARA, the federal accrual date may dictate a claim for personal injury which is "caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility." 42 U.S.C. § 9658(a)(1). And in Covalt we held that release into the environment from a facility under SARA did not include releases into the internal workplace environment, at least where a worker is the injured party. Covalt, 860 F.2d at 1439. In reaching such a conclusion, we indicated that release into the environment must mean something more than opening a container of asbestos because such a reading would trivialize this term. Id. at 1436-37.
 
 
 92
 The defendants argue that the reasoning in Covalt applies to the interpretation of the Illinois joint and several liability provision before us. We do not agree, however, that this case and Covalt are as similar as the defendants paint them. Granted, this court in Covalt focused on the phrase "release into the environment," which is very similar to the "discharge into the environment" language in dispute today. Nonetheless, although this similar phraseology should not be interpreted in a manner that makes it devoid of meaning, it does not necessarily follow that this phraseology has the same meaning under Illinois's joint and several liability statute and CERCLA--two very different statutes.
 
 
 93
 This court's analysis of the release into the environment language in Covalt was not made in a vacuum. To the contrary, the Covalt decision focused on the purposes underlying CERCLA and SARA in deciding the meaning of this term. And one fact that heavily influenced the panel's interpretation of this language was the notion that CERCLA and SARA are primarily concerned with hazardous waste or disposal sites rather than regulating the productive uses of hazardous substances. Id. at 1437-38. Because of CERCLA's and SARA's apparent emphasis on nonproductive uses of hazardous substances, this court determined that release into the environment would not include the release into the environment of asbestos which was used at the workplace, particularly when it is an employee who was exposed to the asbestos. See also 3550 Stevens Creek Assoc. v. Barclays Bank of California, 915 F.2d 1355 (9th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991) (indicating that the environment under CERCLA does not include the internal, workplace environment, but again such a conclusion was highly dependent on the fact that the applicable provision was concerned with wastes and disposal activities and not productive uses of asbestos for building material; moreover the meaning of environment was not contested in that case).
 
 
 94
 Illinois's joint and several liability statute does not contain a similar focus on hazardous waste and disposal sites. Indeed, this statute focuses on "the discharge into the environment of any pollutant, including any waste, hazardous substance, irritant or contaminant, including ... asbestos...." Ill.Rev.Stat., ch. 110, p 2-1118 (emphasis added). This language makes it clear that hazardous wastes and discharges into hazardous waste and disposal sites are just a subcategory of discharges covered by this joint and several liability statute, meaning that the analysis in Covalt does not apply to this case.
 
 
 95
 Moreover, we must remember that CERCLA, a federal statute, focuses on the national concern of public health and environment while Illinois's joint and several liability statute focuses on individual, personal injury and property claims. With this change in focus may come a change in the meaning of the term environment.
 
 
 96
 The second line of cases also relied on by the defense pertains to "pollution exclusions" in insurance contracts. One such case is United States Fidelity & Guaranty Co. v. Wilkin Insulation Co., 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991), an Illinois Supreme Court decision addressing whether a particular insurance contract's pollution exclusion relieved the insurance company of the duty to defend Wilkin Insulation Company in asbestos-related law suits pertaining to the release of asbestos during the installation of insulation. The relevant clause from that case states as follows: "It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, ... irritants, contaminants or pollutants into or upon the land, the atmosphere or any water course or body of water...." Id., 161 Ill.Dec. at 287, 578 N.E.2d at 933.
 
 
 97
 In Wilkin the court stated, "The ordinary, popular meaning of the phrase 'the atmosphere' connotes the external atmosphere which surrounds the earth and consists of the air and any gases or particles therein.... We do not understand 'the atmosphere' to mean the multiple, diverse internal environs or surroundings of individual buildings." Id. Defendants apparently take the position that the Illinois Supreme Court would say the same about the term environment. We first note that it is not entirely clear that environment and atmosphere carry the same connotation. We further note that the Illinois Supreme Court in Wilkin relied on the pollution exclusion's broad language when reaching such a conclusion. That is, the Illinois Supreme Court read atmosphere in conjunction with the surrounding terms "into or upon land" and "any course or body of water" in reaching the conclusion that this clause focused on the external and not the internal atmosphere. The language at issue today, "discharge into the environment," is not surrounded by such equally broad terms.
 
 
 98
 We finally note that, although seeming to prefer the interpretation of atmosphere which refers only to the external atmosphere, the Illinois Supreme Court in Wilkin specifically stated that the term atmosphere is subject to two reasonable interpretations. Id. And, accordingly, the court said it would construe the clause against the insurer-drafter, meaning that it would construe atmosphere to mean the external and not internal atmosphere. There is no such rule of construction to help either party before this court.
 
 
 99
 Considering all this we are still left without definite guidance as to whether discharge into the environment in this joint and several liability statute includes the internal, workplace environment. We agree that discharge into the environment is a limiting principal which must carry some meaning and that it must mean more than opening a container of asbestos products inside a building. The problem is deciphering the bounds of this limitation. This case involves the cutting, gouging, chiseling, and installation of large amounts of asbestos, whereby such activities caused substantial amounts of dust to remain suspended in the air for long periods of time. This is far more than merely opening an asbestos container inside a building. And, therefore, interpreting this case as falling within the discharge into the environment provision would not leave this language devoid of meaning. But this still leaves open the question whether such an interpretation comports with legislative intent. In hopes of deciphering such intent, we will compare the language under Illinois's joint and several liability statute to similar language in the Illinois Environmental Protection Act ("IEPA"), and then we look to legislative history.
 
 
 100
 Defendants point to IEPA as authority for the proposition that discharge into the environment means discharge into the external environment, not discharge into the environment internal to a building. Indeed, Keene argues that the discharge into the environment language in Illinois's joint and several liability act should be given the same meaning as it is given under IEPA. The problem, however, as Keene admitted in its brief, is that IEPA is based on CERCLA. See Quincy v. Carlson, 163 Ill.App.3d 1049, 115 Ill.Dec. 68, 70, 517 N.E.2d 33, 35 (1987), appeal denied, 119 Ill.2d 574, 119 Ill.Dec. 383, 522 N.E.2d 1242 (1988). This means that the same facts which distinguished the interpretation of environment under CERCLA and SARA may also apply when interpreting IEPA. This, however, is only one of several flaws in defendants' argument.
 
 
 101
 Illinois's joint and several liability statute does not contain a definitional section defining the term discharge or environment. IEPA does contain a specific section defining the term release as, "any ... discharging ... into the environment, but excludes (a) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons...." Ill.Rev.Stat., ch. 111 1/2, p 1003.33. The fact that this section exempts only workplace discharges in actions against the employer, indicates that workplace discharges that do not involve suits against the employer constitute discharges into the environment. Moreover, the mere presence of this exception suggests that in the Illinois legislature's view discharge into the environment normally includes discharges into the internal, workplace environment because if this were not the case such an exclusion would be unnecessary. We can assume if the legislature intended to similarly limit the definition of discharge into the environment under the joint and several liability statute, the legislature would have explicitly done so.
 
 
 102
 Not only can we assume that the legislature would have imposed a similar limitation in the joint and several liability context if that was its intention, but we further note that even if discharge into the environment had the same meaning in this case as it does under Section 1003.33 of the IEPA, this would not help the defendants because 1003.33 only excludes workplace discharges from its meaning in suits against the employer. This suit is one against the manufacturers of asbestos products, not Mr. Tragarz's former employers.
 
 
 103
 Now we look to the legislative history underlying the joint and several liability statute. It is often difficult to decipher legislative intent from statements of various legislators. And this task becomes even more cumbersome when the varying legislator's statements are in conflict with one another. Nonetheless, legislative history may be of some help to the extent it summarizes a law's background and the assumptions of those who wrote and voted on the law. Covalt, 860 F.2d at 1438.
 
 
 104
 The defendants provided portions of legislative history underlying Illinois's joint and several liability statute in hopes of supporting their argument that environment means the external environment and not the internal workplace environment. Nonetheless, this legislative history seems to support the plaintiff not the defendants.
 
 
 105
 The statement of Representative Greiman, the statute's sponsor, in a transcription debate before the Illinois General Assembly indicates that the joint and several liability statute was part of omnibus legislation to reduce insurance rates. Transcription Debate, State of Illinois, 84th General Assembly, House of Representatives, June 30, 1986, pp. 1-7. Representative Greiman indicated that the need to reduce insurance rates was such a great concern that a Governor's Task Force was created to look into this issue. And Representative Greiman indicated that an issue of primary concern to the Governor's Task Force was the need to limit joint and several liability in strict products liability actions. Id. at 5. Nonetheless, before emphasizing the need for changes to the common law joint and several liability rules in this and other contexts, Representative Greiman indicated that the Task Force found it necessary to create an exception in environmental cases. Apparently speaking on behalf of the Governor's Task Force, Representative Greiman stated the following in explaining the reasons underlying this so-called environmental exception: "We said that for environmental cases, because so often there are hundreds of defendants that may, in fact, cause an environmental danger, joint and several remains." Id. The implicit meaning underlying this statement is that although it is desirable to lower insurance rates, it would be unfair and overly burdensome to eliminate joint and several liability in so-called environmental cases. Apparently the rationale is that environmental cases as a group tend to involve many defendants. And while it might seem fair to generally require plaintiffs to bear the burden of demonstrating either that every defendant is over twenty-five percent culpable or in demonstrating the comparative fault of those under twenty-five percent culpable, in environmental cases it is too burdensome to require a plaintiff to divide the pie of culpability into potentially hundreds of distinct components, especially considering that, although hundreds of defendants might be culpable, none may be over twenty-five percent at fault. Moreover, the burden of demonstrating the proportionate liability of many defendants would seem to be even more acute when considering that it sometimes takes years for injuries from environmental hazards to surface--a fact made patently evident in mesothelioma cases where the latency period between exposure to asbestos and the disease is around twenty years.
 
 
 106
 None of the legislative history brought to our attention by the defendants indicates that the legislature intended the exception contained in Section 2-1118 of the joint and several liability statute to apply only to those types of cases that would also fall within the scope of the Illinois Environmental Statute, CERCLA, or SARA. And there is nothing in the language of Section 2-1118 or the legislative history provided by the defendants indicating that environment does not include the internal environment. Indeed, when we consider the purpose underlying Section 2-1118's discharge into the environment exception, it seems that cases like this, which involve the exposure to numerous manufacturers' asbestos products, fall within this exception.
 
 
 107
 Because a comparison of the joint and several liability provision and IEPA indicates that discharge into the environment under the joint and several liability statute includes large discharges of asbestos into an internal workplace environment, and because such an interpretation is consistent with, and in fact promotes, the legislative purpose reflected in the legislative history, we agree with the district court's conclusion that this case involves a discharge into the environment of asbestos under Section 2-1118 of the joint and several liability statute. This means that the district court appropriately excluded evidence of Mr. Tragarz's exposure to other manufacturer's products.
 
 
 108
 D. Were Damages Excessive?
 
 
 109
 Now we come to the question of excessive damages. Keene argues in its brief that the jury award of $3,000,000 was excessive. Keene made and the district court denied a motion for a new trial on this basis. Keene argues that the district court erred in denying this motion.
 
 
 110
 "Trial judges may vacate a jury verdict for excessiveness only if it is 'monstrously excessive' or if there is 'no rational connection between the evidence on damages and the verdict,' ... and appellate review is governed by the extremely limited abuse of discretion standard." Joan W. v. Chicago, 771 F.2d 1020, 1023 (7th Cir.1985) (citation omitted). See also Cygnar v. Chicago, 865 F.2d 827, 847-48 (7th Cir.1989). And we have held that one of the ways in which a court may determine whether a verdict is monstrously excessive is to compare the verdict to those in similar cases. Joan W., 771 F.2d at 1023; Cygnar, 865 F.2d at 847-48. The plaintiff cited in its brief several verdicts in mesothelioma cases which exceeded $3,000,000, including the case of Wilson v. Manville, No. 88 C 4220, 1991 WL 5771, a mesothelioma case tried in the Northern District of Illinois in July 1990. The jury returned an award of $4,000,000 in that case. When we consider the verdicts in the cases cited by the plaintiff and the evidence that the plaintiff put forth on the damage issue, we cannot say that the district judge abused its discretion when denying Keene's motion for a new trial on this basis.
 
 E. Denial of Keene's Cross-Claim
 
 111
 The defendants have also raised a myriad of other claims of error involving evidentiary rulings and jury instructions. We will not specifically address these claims. Nonetheless, we have carefully reviewed and considered each of these claims of error and deny the defendants' plea for a new trial on the basis of such claims.
 
 
 112
 There is one further claim of error, however, which we will address, and that is Keene's claim that the trial court erred in denying Keene's motion to file a cross-claim for contribution against OCF. This attempted contribution claim was sought under the Illinois Contribution Among Joint Tortfeasors Act, Ill.Rev.Stat., ch. 70, p 302 et seq.
 
 
 113
 We understand why Keene wishes to appeal this denial for leave to file a cross-claim, but what confuses us is the relief that Keene requests and the fact that the plaintiff and not OCF is urging us to affirm this denial. Keene suggests that because this motion to file a cross-claim was wrongfully denied and because the jury was therefore unable to consider its contribution claim, Keene is entitled to an entirely new trial. We are puzzled by Keene's suggestion that the denial of the cross-claim if in error means that the plaintiff must retry the liability and damage issues. The reason that we are puzzled by such a suggestion is that it misconstrues the nature of contribution claims under Illinois law. That is, Section 304 of the Illinois Joint Tortfeasors Act makes it clear that a plaintiff's rights are unaffected by defendants' contribution claims. Ill.Rev.Stat., ch. 70, p 305. Indeed, even when liability has been apportioned pursuant to such a contribution claim, the plaintiff can still recover the full amount of his or her judgment from any jointly and severally liable defendant. As such, even if Keene's cross-claim was wrongfully denied, this would not affect the plaintiff's judgment against the defendants. Rather, this would only require a new proceeding between OCF and Keene on the contribution issue. We now proceed to the merits of this claim of error.
 
 
 114
 Almost two years before the trial of this case, the defendants were granted leave to file cross-claims. OCF filed a contribution claim against then-defendant Manville, but Keene did not. Then on the morning of the first day of trial, the court inquired if any cross-claims were pending. Defendants said there were not. And Keene did not raise this issue during trial. Rather, Keene waited until the close of evidence during the jury instruction conference before asking for leave to file a cross-claim. The district court denied this motion. We review this denial for abuse of discretion. Textor v. Board of Regents, 711 F.2d 1387, 1391 (7th Cir.1983).
 
 
 115
 Keene correctly asserts that under Federal Rule of Civil Procedure 13(g), a party may file a cross-claim against a co-party which asserts that the "party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant." Fed.R.Civ.P. 13(g). Because Rule 13(g) does not impose any time limitations on the filing of cross-claims, once the parties have filed their initial pleadings, any motion to amend those pleadings and file a cross-claim must be made pursuant to Federal Rule of Civil Procedure 15 which provides:
 
 
 116
 [A] party may amend the party's pleading only by leave of the court ... and leave shall be freely given when justice so requires.
 
 
 117
 Fed.R.Civ.P. 15(a).
 
 
 118
 In Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), the Supreme Court outlined factors that courts should look to in determining whether to grant a party leave to amend: (1) undue delay on the part of the moving party; (2) bad faith on the part of the moving party; (3) dilatory motive on the part of the moving party; (4) the moving party's repeated failure to cure deficiencies by previously allowed amendments; (5) undue prejudice to the opposing party; and (6) futility. In further refining this standard, this court has stated that delay is an insufficient basis for denying a motion to amend unless this delay results in undue prejudice to the opposing party. Textor, 711 F.2d at 1391.
 
 
 119
 Keene argues that because the record demonstrates delay but not prejudice, the district court improperly denied its motion to amend its pleadings. The opposing party in this motion to amend to file a cross-claim is OCF, not the plaintiff. As such, the plaintiff's argument that the granting of the motion to amend would have been prejudicial to her is irrelevant, especially considering that a contribution claim has no effect on the plaintiff under Illinois law. Therefore, the party which should be claiming prejudice is OCF. Yet, OCF has not argued prejudice. Nor has OCF put forth any basis for affirming the district court's denial of leave to file a cross-claim. Accordingly, we consider such arguments waived. And we therefore reverse the district court's denial of Keene's motion to amend its pleadings to add a cross-claim against OCF and remand for proceedings between the defendants on the issue of contribution.
 
 III.
 
 120
 We affirm in part and reverse and remand in part. That is, we affirm the plaintiff's judgment for liability and damages but reverse the district court's order denying Keene leave to amend its pleadings in order to allege a cross-claim against OCF, and we remand this case for proceedings between the defendants on the contribution issue raised in this cross-claim.
 
 
 121
 AFFIRMED IN PART, REVERSED AND REMANDED IN PART.
 
 
 
 *
 Judge Wood, Jr. assumed senior status on January 16, 1992, which was after oral argument in this case
 
 
 **
 The Honorable Thomas J. Curran, District Judge for the Eastern District of Wisconsin, is sitting by designation
 
 
 [1]
 See also the recent case decided by the Illinois Supreme Court on September 21, 1992, Thacker v. UNR Industries, Inc., 151 Ill.2d 343, 177 Ill.Dec. 379, 603 N.E.2d 449