**Margaret HOWARD and Robert Howard, Co–Executors of the Pennsylvania Estate of John C. Ravert, Deceased, Appellants**

**v.**

**A.W. CHESTERTON COMPANY, Ace Hardware Corp., Monsey Products Corp., Pecora Corporation, and Union Carbide Corporation, Appellees.**

Superior Court of Pennsylvania.

Argued July 26, 2011.

Filed Oct. 28, 2011.

Reargument Denied Dec. 20, 2011.

Robert E. Paul, Philadelphia, for appellants.

John J. Bateman, Philadelphia, for Ace, appellee.

Carl Bucholz, Philadelphia, for Monsey, appellee.

Jennifer A. Stern, Philadelphia, for Pecora, appellee.

Richard L. Walker, III, Philadelphia, for Union Carbide, appellee.

BEFORE: LAZARUS, MUNDY, and FREEDBERG, JJ.

OPINION BY MUNDY, J.:

Appellants, Margaret Howard and Robert Howard, co-executors of the estate of John C. Ravert (Ravert), deceased, and plaintiffs in the underlying asbestos mass tort litigation, appeal from the judgment entered October 5, 2010, in favor of defendants/Appellees, A.W. Chesterton Co. (Chesterton), ACE Hardware Corp. (ACE), Monsey Products Corp. (Monsey), Pecora Corporation (Pecora), and Union Carbide Corporation (Union Carbide). Judgment, relative to Appellees, was entered after the trial court granted their

respective motions for summary judgment. We vacate the judgment, reverse the orders granting summary judgment in favor of each Appellee, and remand for further proceedings.

The trial court summarized the procedural history of this case as follows.

[Appellants] [1] commenced this Asbestos Mass Tort action alleging that Decedent John C. Ravert contracted mesothelioma as a result of his occupational exposure to asbestos products. On March 25, 2008, ACE, Chesterton, Monsey, and Pecora filed for summary judgment. On March 27, 2008, Union Carbide filed for summary judgment. On April 11, 2008, [Appellants] filed a response to each of the motions. Pecora replied on April 13, 2008. ACE, Chesterton, and Monsey replied on April 16, 2008. Union Carbide replied on April 18, 2008. [Appellants'] counter replies were filed for Union Carbide on April 23, 2008; for Pecora on April 24, 2008; and for ACE, Chesterton, and Monsey on April 28, 2008. Replies to [Appellants'] counter replies were filed on April 28, 2008 by ACE (as a sur[-]reply); April 30, 2008 by Monsey; and May 6, 2008 by Chesterton. All of [Appellees'] motions asserted lack of sufficient product identification as required by *Ekenrod* [*Eckenrod* ] *v. GAF Corp.* [375 Pa.Super. 187], 544 A.2d 50 (Pa.Super.1988) and its progeny.

After careful review of the motions, responses, replies, and sur-reply, [the trial c]ourt granted summary judgment in favor of each of the [Appellees] and dismissed with prejudice [Appellants'] claims on May 14, 2008. The case was then removed by remaining Defendants Weil McClain and Goodyear to the United States District Court for the Eastern District of Pennsylvania on May 20, 2008. On May 30, 2008, [Appellants] timely filed appeals from the orders granting summary judgment to [Appellees].

On July 1, 2008, in response to [the trial c]ourt's order, [Appellants] filed their Concise Statement of Errors Complained of on Appeal pursuant to Pa. R.A.P. § 1925(b). [The trial c]ourt issued its Opinion [on] August 6, 2008.

On October 1, 2009, the Pennsylvania Superior Court ruled that [Appellants'] appeal was interlocutory because there were still two remaining defendants in the case; therefore the order was not a final, appealable order. By Order dated November 12, 2009, the Honorable Eduardo Robreno remanded the case back to the trial court finding that the removal to federal court was improper because there were no grounds to invoke federal subject matter jurisdiction under 28 U.S.C. § 1332.

On September 10, 2010, [Appellants] settled with all remaining defendants prior to trial. Thereafter [Appellants] petitioned the Superior Court to reinstate the appeal initially filed May 30, 2008 (1731 EDA 2008). The Superior Court denied [Appellants'] petition on [sic] reinstate the previous appeal, however [Appellants] filed a new appeal on October 8, 2010 (2978 EDA 2010). [Appellants] [filed] a subsequent Concise Statement of Errors Complained of on Appeal.

Trial Court Opinion, 3/24/11, at 1–3; C.R. at supplemental record (citation omitted).

Appellant raises the following questions for our review.

---

1. The instant action was commenced by Ravert who subsequently died on September 18, 2007, whereupon his executors were substituted as plaintiffs in the case. Certified Record (C.R.) at 76.

I. Did the lower court commit an error of law when it failed to apply correctly Pennsylvania Supreme Court precedent of *Gregg v. V–J Auto, Inc.* [596 Pa. 274], 943 A.2d 216 (Pa.2007)?

II. Did the lower court commit an error of law by requiring [Appellants] to prove that Mr. Ravert was exposed to visible dust rather than to respirable dust?

III. Did the lower court err at summary judgment when it when it [sic] failed to rule that there were genuine issues of material facts as to Mr. Ravert's exposure to Appellees' asbestos products because it did not properly apply the precedents of *Summers v. CertainTeed* [*Certainteed*] *Corp.* [606 Pa. 294], 997 A.2d 1152 (Pa.2010) and *Hicks v. Dana Corporation*, 984 A.2d 943 (Pa.Super.2009), *appeal denied* [—— Pa. ——, 19 A.3d 1052], 2011 Pa. LEXIS 660 (Pa.2011)?

Appellants' Brief at 6.[2]

Our Supreme Court has recently reiterated the principles that must guide our inquiry in this appeal.

> As has been oft declared by this Court, "summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 812 A.2d 1218, 1221 (2002); Pa. R.C.P. No. 1035.2(1). When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. *Toy v. Metropolitan Life Ins. Co.*, 593 Pa. 20, 928 A.2d 186, 195 (2007). In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment "where the right to such judgment is clear and free from all doubt." *Id.* On appellate review, then,

> > an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo*. This means we need not defer to the determinations made by the lower tribunals.

> *Weaver v. Lancaster Newspapers, Inc.*, 592 Pa. 458, 926 A.2d 899, 902–03 (2007) (internal citations omitted). To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record. *Id.* at 903.

*Summers v. Certainteed Corp.*, 606 Pa. 294, 997 A.2d 1152, 1159 (2010).

In their respective motions for summary judgment, Appellees claimed Appellants had failed to adequately establish that Ravert was exposed to and inhaled asbestos fibers as a result of his use of Appellees' products under the frequency, regularity and proximity test of *Eckenrod, supra,* and its progeny. The asbestos-containing products at issue, as testified to by Ravert in his various videotaped depositions, include: for Chesterton, string packing used to seal pumps; for ACE, roof coating and roof cement; for Monsey, roof coating and roof cement; for Pecora, furnace cement; and for Union Carbide, powdered asbestos that Ravert mixed to seal furnaces.

Appellants' three issues pertaining to the motions filed by Chesterton, ACE,

---

**2.** Chesterton did not file a brief in this appeal.

Monsey, and Pecora present interrelated issues. We consequently will discuss them together. Appellants' broad contention is that the trial court misapplied the standard it was required to follow when considering Appellees' motions for summary judgment in three ways. Appellant first contends the trial court erred by misinterpreting a plaintiff's burden to establish regular, frequent, and proximate exposure to asbestos from a defendant's product under prevailing case law in a mesothelioma case. "The lower court erroneously interpreted *Gregg* as requiring the same regularity, frequency and proximity in all asbestos cases, regardless of the injured party's disease. In so doing, it ignored the fact that *Gregg* was following *Tragarz* [*v. Keene Corp.*, 980 F.2d 411 (7th Cir.1992) ], which held that in such diseases as mesothelioma, a small amount of asbestos exposure can cause mesothelioma." Appellant's Brief at 16–17. Appellant next contends the trial court erred by finding Ravert's factual admissions about an absence of visible asbestos-containing dust were equivalent to admissions of an absence of invisible respirable asbestos fibers. "[Appellants'] expert affidavits, along with the testimony of defense witnesses Drs. Sawyer, Roggli, and Krebs, all stated that asbestos fibers are not necessarily visible to the naked eye. Thus, it was an error of law for the lower court to equate visible dust with respirable dust." *Id.* at 18. Finally, Appellant alleges the trial court erred by discounting the relevance of his experts' affidavits in establishing a genuine issue of material fact relative to Ravert's exposure to asbestos from Appellees' products. "Since Mr. Ravert used Chesterton asbestos packing, as well as Ace, Monsey and Pecora asbestos cements, it was error to say that the affidavits addressing the use of asbestos products and these types of products in particular, were not relevant to whether

there was a genuine issue of material fact as to the issue of whether [Appellees'] asbestos products were causes-in-fact of Mr. Ravert's mesothelioma." *Id.* at 20.

Relying chiefly on portions of Ravert's deposition, the trial court concluded Ravert's admissions that he did not see any "dust" when using Appellees' products precluded a finding that a material issue of fact existed relative to Ravert's exposure to asbestos from those products.

> Decedent, John Ravert was deposed by all [Appellees] on June 25–27, 2007 and July 17–18, 2007. His deposition testimony fails to establish that [Ravert] was exposed to asbestos fibers or asbestos dust shed from working with [Appellees'] products with the frequency, regularity, and proximity required under Pennsylvania law.[1]
>
> ———
> [1] The terms "dust" and "fibers" are used interchangeably as they are microscopic and cannot generally be seen with the naked eye.

Trial Court Opinion, 3/24/11, at 4 (footnote in original).

■ We agree with Appellant that the trial court failed to interpret the evidence in a light most favorable to the nonmoving party. Rather, the trial court engaged in an inappropriate weighing of the evidence, and the inferences to be drawn therefrom, to conclude that no genuine issue of material fact existed relative to Ravert's exposure to respirable asbestos fibers from Appellees' products.

■ With respect to the standard applied by the trial court in evaluating Appellants' burden in an asbestos product liability case under *Eckenrod, supra,* and its progeny, we note the following recent articulation of the standard by this Court.

> In Pennsylvania, a plaintiff who suffers an asbestos related injury is not required to establish the specific role played by each individual asbestos fiber

within the body; nor must the plaintiff quantify the specific level or duration of his asbestos exposure. Instead, in order to make out a prima facie case, it is well established that the plaintiff must present evidence that he inhaled some asbestos fibers shed by the specific manufacturer's product. In assessing a plaintiff's evidence, Pennsylvania courts employ the frequency, regularity and proximity test.

The frequency, regularity and proximity test is not a rigid test with an absolute threshold necessary to support liability. *Gregg v. V–J Auto Parts Co.,* 596 Pa. 274, 943 A.2d 216, 225 (2007). Rather, application of the test should be tailored to the facts and circumstances of the case; for example, its application should become "somewhat less critical" where the plaintiff puts forth specific evidence of exposure to a defendant's product. **Similarly, the frequency and regularity prongs become less cumbersome when dealing with cases involving diseases, like mesothelioma, which can develop after only minor exposures to asbestos fibers.**

*Linster v. Allied Signal, Inc.,* 21 A.3d 220, 223–224 (Pa.Super.2011) (emphasis added).

In its 1925(a) opinion, the trial court described the test it followed in reviewing Appellees' motions for summary judgment as follows.

Our Superior Court in *Eckenrod vs. GAF Corp.* [375 Pa.Super. 187], 544 A.2d 50 (Pa.Super.1988), set forth the elements necessary to prove a *prima facie* case of asbestos liability:

In order for liability to attach in a products liability action, plaintiff must establish that the injuries were caused by a product of the particular manufacturer or supplier. Additionally, in order for a plaintiff to defeat a motion for summary judgment, a plaintiff

must present evidence to show that he inhaled asbestos fibers shed by the specific manufacturer's product. Therefore, a plaintiff must establish more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use. Summary judgment is proper when the plaintiff has failed to establish that the defendants' products were the cause of the plaintiff's injury.

*Id.* at 52 (internal citations omitted).

Further, our Supreme Court in *Gregg v. V–J Auto Parts, Co.* [596 Pa. 274], 943 A.2d 216 (Pa.2007), recently reiterated the duty of a lower court when reviewing an asbestos motion for summary [judgment] based on product identification:

... [W]e believe that it is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in light of the evidence concerning frequency, regularity, and proximity of Plaintiff's/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between the defendant's product and the asserted injury.

*Id.* at 30.

Trial Court Opinion, 3/24/11, at 4.

Significantly, the trial court does not cite nor apparently follow the qualifying principles first expressed in *Gregg, supra,* and reiterated in *Linster, supra,* regarding the flexibility of a plaintiff's burden as tailored to each specific case. Accordingly, Appellant alleges "[t]he [trial] court erroneously interpreted *Gregg* as requiring the same regularity, frequency and proximity in all asbestos cases, regardless of the injured party's disease." Appellant's brief at 17. We agree. By applying the *Eckenrod* standard without adapting it to the particular circumstances of this case, including

Ravert's diagnosis of mesothelioma, we conclude the trial court erred.

■ It remains for us to determine if the alleged deficiencies in Appellants' case, relied on by the trial court in granting the summary judgment motions, are sufficient to uphold the trial court's determination under the proper standard. We turn, therefore, to the trial court's reliance on purported admissions contained in Ravert's deposition testimony. The trial court cited the following excerpts of Ravert's deposition testimony in reaching its decision.

In connection with Chesterton products, Appellant testified as follows.

Q There wasn't any dust created in that process: was there?

A No. There was dust from the people walking in the basement.

Chesterton's Motion for Summary Judgment, Exhibit A, N.T., Deposition of John Ravert, 7/17/07, at 281; C.R. at 97.

In connection with ACE products, Appellant testified as follows.

Q When you would purchase the roof coat, can you explain how you would use the roof coat?

A How I used the roof coat?

Q Yes.

MR. PAUL: You're talking about the Ace one?

MS. ADAMS: Yes, yes.

THE WITNESS: Well, the first thing I would do is I would bring it up to the roof. The second thing is I would pry it open, then I would take and put it over the spot to renew the spot that was damaged.

BY MS. ADAMS:

Q And what type of tool would you use to put it over the spot?

A You could use a brush or you can use a mop, or—you know, either one. I usually used a mop, an old mop to spread it around. But we would leave it on the roof and they would dry out, so you couldn't use them anymore.

Q When you were applying the roof coat, was there any type of dust generated in that process?

A Just cleaning the roof where you were going to put it down. You got that dust in there.

Q But no dust from the roof coat itself?

A No. It was a liquid, now. I don't believe you can get dust from a liquid.

Q Now, as for the roofing cement, can you tell me how you used the roofing cement?

A Well, say downstairs there would be a leak and we couldn't find the leak up there, so I would get down on my knees and hands and keep going over the spot where it was leaking. Basically where—just about the spot where it was leaking until I found it, then I would take and put the roof cement down over that and a piece of gauze and then another coating of roof cement.

Q And how would you apply the roof cement?

A With a trowel.

Q And was any dust generated when you were using the roof cement?

A No.

ACE's Motion for Summary Judgment, Exhibit B, N.T., Deposition of John Ravert, 7/18/07, at 604–605; C.R. at 122.

In connection with Monsey products, Appellant testified as follows.

Q How about the roof coating, how long—

A The roof coating would be two days and it would be perfectly dry depending if it had a lot of bubbles and get some of the bubbles and stuff like that.

Q   Was there any dust involved in the application of either the cement or the coating?

A   They were a liquid, they didn't have dust.   But cleaning off the roof, you know, the old dust from the tar paper.

Q   Was there any dust involved in the application of the tar paper?

A   No.

Monsey's Motion for Summary Judgment, Exhibit A, N.T., Deposition of John Ravert, 7/18/07, at 502; C.R. at 95.

In connection with Pecora products, Appellant testified as follows.

Q   Sir, from the description of applying this product, either by hand or with a trowel, this would not be considered a dusty application; would it?

A   No—

MR. PAUL:  What you guys are talking about—my question is, because it's a definitional question, what do you mean by "dusty"?  I object to the form.

THE WITNESS:  He's objecting to—

MR. PAUL:  I'm objecting to the form.  The question is, I'm not sure that you and he used the term "dusty" in the same way, so I would like him to define what he means by it or—

THE WITNESS:  Can you define what you mean by "dusty"?

BY MR. HADDEN:

Q   Do you understand my question, sir?

A   You just asked me if it was a dusty product.

Q   The application, putting this product onto the furnaces, that was not, in your mind, a dusty application; was it?

A   No, no.

Pecora's Motion for Summary Judgment, Exhibit A, N.T., Deposition of John Ravert, 6/27/07, at 333–334; C.R. at 98.

Indeed the trial court, in its 1925(a) opinion, indicated "[t]he terms 'dust' and 'fibers' are used interchangeably as they are microscopic and cannot generally be seen with the naked eye."   Trial Court Opinion, 3/24/11, at 4, n. 1.   However, no such equivalency between the terms was expressed or implied in the questions posed to Ravert or in his responses.   We note that nowhere in the deposition transcript is the term "dust" defined.   Neither, in the context of the questions posed to Ravert, is a meaning other than its common usage stated or implied.   We conclude the trial court erred to the extent it equated Ravert's responses about the dustiness of the various products or their application with an admission that no Asbestos **fibers** were inhaled from those products or applications.   In doing so the trial court did not construe the testimony in the light most favorable to the nonmoving party and imposed its own inferences on the evidence when an alternate inference, that no **visible dust** was inhaled, was possible.

■   Appellants sought to establish that Ravert, nevertheless inhaled invisible asbestos fibers from his contact, use and application of Appellee's products through the use of expert affidavits and exhibits.   Ravert testified to his use of and proximity to the various products at different times throughout his years of employment.   *See generally* Deposition of John Ravert, 6/27/07, 7/17–18/07;  C.R. at 95, 97, 98, 122.   To support an inference that the use and proximity described could result in inhalation of asbestos fibers from those products, Appellants proffered a number of expert affidavits and reports.   These include the following excerpts from affidavits attached to Appellants' answers to the various motions for summary judgment.

11   Any witness herein who testifies that when he or a coworker handled the asbestos gaskets, packing, welding rods, brake linings or even cement products, that he did not see

asbestos or other airborne fibers, was exposed to and inhaled without his knowledge, millions of asbestos fibers.

12 Any gasket, packing, brake lining, welding rod or cement manufacturer who argues that there was no exposure to asbestos dust from its product: because a witness testified that he did not see any dust is making a false argument. These products release asbestos fibers in their ordinary and intended use.

Appellants' Answers to Appellees' Motions for Summary Judgment, Exhibit, 11/16/06 Affidavit of James Gerard, Ph.D.; C.R. at 130–140.

18. The encapsulation of asbestos-containing materials does not prevent individuals from being exposed to asbestos fibers in a manner that can cause disease as the encapsulation is never 100% and various factors cause the encapsulation to break apart, such as heat, fracture, friction, or abrasion. Also, initially moist asbestos-containing materials can dry out and subsequently release disease-causing asbestos fibers. The encapsulation is often damaged in the operations described in this paragraph, releasing asbestos fibers under such circumstances.

. . .

21. Taken together, it is my opinion, to a reasonable degree of medical certainty, that exposure to asbestos from gaskets and/or packing materials and/or welding rod or brake linings or cement can substantially contribute to cause the development of asbestos-related diseases and did so in this or any other gasket, brake lining or welding rod case where the exposures are determined to exist.
22. In the instant matter there was sufficient exposure to asbestos from gaskets, packing, brake linings, welding

rods or cement and/or other products to determine that such exposure was a substantial contributing factor in causing the disease.

Appellants' Answers to Appellees' Motions for Summary Judgment, Exhibit, 2/26/07 Affidavit of Arthur Frank, M.D.; C.R. at 130–140.

The trial court discounted this evidence as follows.

Now burdened with [Ravert's] testimony which cannot support its claims, [Appellants] go on to engage in a deconstruction of this testimonial evidence and create an artificial record which attempts to dehor [Ravert's] observation denying the existence of asbestos dust. They submitted seven exhibits along with their Response to the Motion for Summary Judgment alleging that roof cement products dried quickly enough so as to see asbestos dust. [Appellants] also submitted several affidavits, pretrial examinations, and news articles in an attempt to support their claims that respirable fibers were present. However much of this information is irrelevant to this case in general and ACE specifically. The simple fact remains that [Appellants'] attempt to impeach [Ravert] fails because [Ravert] testified that he never inhaled dust from ACE roofing materials. Clearly, [Appellants] cannot meet the *Ekenrod* [*Eckenrod* ] test.

Trial Court Opinion, 3/24/11, at 6 (citations to record omitted).

We recognize, as pointed out by Appellees, that our Supreme Court in *Gregg* noted that "one of the difficulties courts face in the mass tort cases arises on account of a willingness on the part of some experts to offer opinions that are not fairly grounded in a reasonable belief concerning the underlying facts and/or opinions that are not couched within accepted scientific

methodology." *Gregg, supra* at 226. Our Supreme Court concluded, "we believe that it is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in light of the evidence concerning frequency, regularity, and proximity of a plaintiff's/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between the defendant's product and the asserted injury." *Id.* at 227.

Appellees justify the trial court's position by questioning the validity of the opinions advanced in Appellants' submissions. For example, ACE argued in its appellate brief that

> neither of the expert affidavits relied upon by [Appellants] in this matter define a methodology in their decision making or even cite to any scientific studies or articles conducted on roofing products which would support the conclusions made in their affidavits. These affidavits are merely compilations of generic, non-case specific, self-serving, generalized opinions that have no basis in scientific fact and are not sufficient to meet the threshold causation requirement and survive summary judgment. Consequently, the lower court acted well within its discretion in determining that they were insufficient to meet the competency and reliability requirements to overcome summary judgment.

ACE's Brief at 20.

We note that such a restrictive reading of *Gregg* has been qualified when dealing with diseases such as mesothelioma.

> As we construe these arguments, the medical opinion that "each and every breath" contributed to cause Mr. Hicks' disease should be rejected as a matter of law because it would allow plaintiffs to recover after establishing exposure to only very small amounts of asbestos fibers as opposed to a substantial number of fibers. We believe this is an overly expansive reading of the holding in *Gregg.* We note, as the *Tragarz* court made clear,

>> the substantial factor test is not concerned with the quantity of the injury-producing agent or force but rather with its legal significance.... Where there is competent evidence that one or a de minimis number of asbestos fibers can cause injury, a jury may conclude the fibers were a substantial factor in causing a plaintiff's injury.

> *Tragarz,* 980 F.2d at 421 (quoting *Wehmeier v. UNR Industries, Inc.,* 213 Ill. App.3d 6, 31, 157 Ill.Dec. 251, 572 N.E.2d 320 (Ill.App.Ct. 4th Dist.1991)).

*Estate of Hicks v. Dana Companies, LLC,* 984 A.2d 943, 957 (Pa.Super.2009), *appeal denied,* —— Pa. ——, 19 A.3d 1051 (2011), *appeal denied,* —— Pa. ——, 19 A.3d 1052 (2011). "We do not read *Gregg* as precluding an expert from opining that Mr. Hicks' mesothelioma resulted from the cumulative effect of repeated, low-level exposures over a forty-year work history." *Id.* at 959.

Instantly, the trial court does not elaborate on its dismissiveness toward Appellants' expert exhibits and affidavits other than to refer back to Ravert's statements relative to "dust" in the application of Appellees' products. This is not the "reasoned assessment" contemplated by *Gregg,* and we conclude the trial court's determination that no genuine issue of material fact existed relative to Ravert's exposure to asbestos from Appellees' products was erroneous.

We turn now to the summary judgment granted to Union Carbide. The trial court based its grant of Union Carbide's summary judgment motion on testimony from Ravert it deemed precluded the possibility he was exposed to Union Carbide's prod-

uct. The trial court cited the following portions of Ravert's testimony.

Q   What's your date of birth?

A   May 16, 1946.

. . . .

Q   And what was your first job, sir?

A   My first job was at Bee Fuel Oil Company.

Q   What did you do for Bee Fuel?

A   For Bee Fuel Oil Company?

Q   Yes. What type of work did you do?

A   When I first stated [sic], I worked there in the summer, just—

Q   How old were you?

A   I was fourteen.

Q   So, we're talking about 1950—1960, something like that?

A   Yeah, something like that.

Union Carbide's Motion for Summary Judgment, Exhibit A, N.T., Deposition of John Ravert, 7/18/07, at 11–12; C.R. at 128.

Q   What period of time did you work for Bee Fuel, sir?

A   Like I said, from fourteen almost until I was sixteen, almost.

*Id.* at 15.

Q   Okay. With the bags of asbestos?

A   No, we didn't use asbestos. We used the cement that contained asbestos.

Q   The Union Carbide bag that we just spoke about, those bags you recall from Bee Fuel Oil Company; is that correct?

A   Yes.

Q   Okay. And that's the only place you recall them from; is that correct?

A   Yes. Gypsum Company, too, we used. There was two.

MR. PAUL: She only asked about Union Carbide.

THE WITNESS: Oh, Union Carbide. Yeah, but I told her before this.

Appellants' Response to Union Carbide's Motion for Summary Judgment, Exhibit A, N.T., Deposition of John Ravert, 7/18/07, at 555–556; C.R. at 140.[3]

The trial court noted that affidavits submitted by Union Carbide asserted that the product allegedly used by Ravert during his employment at Bee Fuel Company was not manufactured until 1963, after Ravert ended his employment at Bee Fuel Company. "Plaintiff's tacit approval of [Union Carbide's] assertion that [it] did not manufacture the bags of asbestos [Ravert] remembers until 1963 is enough to resolve doubt that there exists any material fact." Trial Court Opinion, 3/24/11, at 12.

■ Appellant counters that [Appellants] made no such tacit approval, as the [trial] court conflated statements on several different products to ignore and reject evidence that favored the moving party. Mr. Ravert testified about asbestos powder, [the affidavit submitted by Union Carbide] Calidra *fiber*, and [Appellants'] response refers to another type of product, *"pastes and cements*[*]* for high temperature uses in steel plants, and attached evidence of Union Carbide's use of asbestos "in the field", i.e., outside its plants. It is not unreasonable to infer that Union Carbide distributed asbestos cement, since it certainly used asbestos cement in the years prior to Mr. Ravert's employment with Bee Fuel, or that Mr. Ravert erred in his recollection of time periods.

Appellants' Brief at 24 (emphasis in original) (citations omitted). After a review of the entire record, we conclude a genuine issue of material fact exists relative to Ravert's exposure to asbestos from a Union Carbide product. In so concluding, we

---

**3.** Ravert stated in his 2007 complaint that he worked for Bee Fuel from 1962–1964.

are mindful of the rule in *Borough of Nanty–Glo v. American Surety Co. of New York,* 309 Pa. 236, 163 A. 523 (1932), that an affidavit from a corporate witness cannot serve as a ground for granting summary judgment when contradictory evidence exists. Instantly, Ravert gave a detailed description of his use of an asbestos powder from bags labeled "Union Carbide" while mixing cement when employed at Bee Fuel Company. The reliability of Ravert's recollections is an issue for a jury. Consequently, we conclude the trial court's grant of summary judgment for Union Carbide on the basis of a credibility determination of Ravert's testimony and Union Carbide's affidavits was error.

For all the foregoing reasons, we reverse the orders granting Appellees' motions for summary judgment, vacate the judgment in favor of Appellees, and remand for further proceedings.

Orders reversed. Judgment vacated. Case remanded. Jurisdiction relinquished.