**Beverly FISHER, Executrix of the Estate of Sidney Fisher, Deceased and Widow in her own right, Appellant**

v.

**J.A. SEXAUER, Kentile, and Pecora Corporation, Appellees.**

Superior Court of Pennsylvania.

Argued Feb. 14, 2012.
Filed May 29, 2012.

 

Richard P. Myers, Philadelphia, for appellant.

James W. Gicking, Philadelphia, for Sexuar, appellee.

Bernard E.J. Quinn, Philadelphia, for Kentile, appellee.

Kenneth J. Powell, Jr., Philadelphia, for Pecora, appellee.

Before BENDER, J., OTT, J., and FITZGERALD, J.*

OPINION BY BENDER, J.

Beverly Fisher, individually and as executrix of the estate of Sidney Fisher ("Fisher"), appeals the trial court's award of summary judgment in favor of defendants J.A. Sexauer, Kentile, and Pecora Corporation. The trial court concluded that Fisher, whose action sought to recover for the death of her husband from asbestos-related illness, failed to adduce sufficient evidence to raise a question of material fact concerning causation. Fisher contends that the trial court erred in its assessment of the record and failed to grant her the benefit of all reasonable inferences. Upon review of the record, we find no reversible error in the trial court's determination. Accordingly, we affirm.

Fisher and her husband, Sidney Fisher, now deceased, commenced this action following a diagnosis in March 2006 that Mr. Fisher suffered from small-cell carcinoma accompanied by functional impairment consistent with exposure to asbestos. Then 77 years old, Mr. Fisher had worked throughout his life as a journeyman plumber and had used or worked in the vicinity of construction materials that contained asbestos for approximately fifty years. Fisher asserts that among the materials to which her husband was exposed

---

* Former Justice specially assigned to the Superior Court.

were plumber's packing manufactured by J.A. Sexauer, vinyl asbestos tile manufactured by Kentile, and furnace cement manufactured by Pecora Corporation. Although Mr. Fisher had also smoked 1½ to 2 packs of cigarettes daily during his younger years, he had been smoke-free during the last three decades of his life. He died in December 2006, but recorded deposition testimony before his passing.

Following discovery, Sexauer, Kentile, and Pecora filed motions for summary judgment on the basis of asserted deficiencies in the decedent's deposition testimony, contending that it failed to establish the requisite threshold for asbestos exposure recognized by this Court in *Eckenrod v. GAF Corp.*, 375 Pa.Super. 187, 544 A.2d 50 (1988). Upon review, the trial court, the Honorable Allan L. Tereshko, agreed that Mr. Fisher's testimony had not satisfied the "frequency, regularity, and proximity" standard enunciated in *Eckenrod* and granted the defendants' motions. Fisher now appeals, raising the following questions for our consideration:

I.  Did the [trial] court err as a matter of law when it failed to view the evidence in the light most favorable to the nonmoving parties, ignored certain pieces of evidence, and weighed the evidence as a fact finder when there was a genuine issue of material fact as to Mr. Fisher's exposure on a regular and frequent basis to asbestos from products manufactured by Defendant–Appellant, J.A. Sexauer?

II. Did the [trial] court err as a matter of law when it failed to view the evidence in the light most favorable

to the nonmoving parties, ignored certain pieces of evidence, and weighed the evidence as a fact finder when there was a genuine issue of material fact as to Mr. Fisher's exposure on a regular and frequent basis as to asbestos from brakes[1] manufactured by Kentile?

III. Did the [trial] court err as a matter of law when it failed to view the evidence in the light most favorable to the nonmoving parties, ignored certain pieces of evidence, and weighed the evidence as a fact finder when there was a genuine issue of material fact as to Mr. Fisher's exposure on a regular and frequent basis from brakes manufactured by Pecora Corporation?

Brief for Appellant at 4.

The Pennsylvania Rules of Civil Procedure allow disposition of a case on summary judgment only where the record demonstrates an absence of factual questions material to the elements of the disputed causes of action. We have held accordingly that:

"[A] proper grant of summary judgment depends upon an evidentiary record that either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense [.]" Under [Civil] Rule 1035.2(2), "if a defendant is the moving party, he may make the showing necessary to support the entrance of summary judgment by pointing to materials which indicate that the plaintiff is unable to satisfy an element of his

1.  Fisher's suggestions in her second and third questions that defendants Kentile and Pecora manufactured brakes are neither advanced in argument nor supported by the evidence of record. Rather, it appears that Kentile manufactured floor tile, some of which contained asbestos, and Pecora manufactured asbestos cement used in boilers and furnaces. We conclude accordingly, that Fisher's references reflect typographical errors copied from other documents that are not relevant to the disposition of this case.

cause of action." Correspondingly, "[t]he non-moving party must adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof such that a jury could return a verdict favorable to the non-moving party."

*Basile v. H & R Block, Inc.*, 777 A.2d 95, 100–01 (Pa.Super.2001) (citations omitted). Thus, a plaintiff's failure to adduce evidence to substantiate any element of his cause of action entitles the defendant to summary judgment as a matter of law. *See Ertel v. Patriot–News Co.*, 544 Pa. 93, 674 A.2d 1038, 1042 (1996). As with all questions of law, our scope of review of a trial court's order granting summary judgment is plenary. See id. at 1041. Our standard of review is the same as that of the trial court; we must review the record in the light most favorable to the non-moving party granting [him] the benefit of all reasonable inferences and resolving all doubts in [his] favor. *See id.* We will reverse the court's order only where the appellant ... demonstrates that the court abused its discretion or committed legal error. *See Basile*, 777 A.2d at 101.

*Shipley Fuels Marketing, LLC v. Medrow*, 37 A.3d 1215, 1217 (Pa.Super.2012) (quoting *Montagazzi v. Crisci*, 994 A.2d 626, 629–630 (Pa.Super.2010)).

In this case, Fisher argues that the trial court failed to draw inferences in her favor as required by the standard of review applicable to summary judgment, and thus disregarded questions of fact concerning the extent of asbestos exposure her deceased husband suffered. Upon review, we find no error in the trial court's disposition as, even when viewed in the light most favorable to the non-moving party, the evidence fails to establish that the decedent's exposure reached the threshold established by *Eckenrod*.

"In order for liability to attach in a products liability action, plaintiff must establish that the injuries were caused by a product of the particular manufacturer or supplier. Additionally, in order for a plaintiff to defeat a motion for summary judgment, a plaintiff must present evidence to show that he inhaled asbestos fibers shed by the specific manufacturer's product." *Eckenrod*, 544 A.2d at 52 (citations omitted).

The evidence [of exposure] must demonstrate that the plaintiff worked, on a regular basis, in physical proximity with the product, and that his contact with it was of such a nature as to raise a reasonable inference that he inhaled asbestos fibers that emanated from it. *See Samarin v. GAF Corp.*, 391 Pa.Super. 340, 571 A.2d 398, 405 [ (Pa.Super.1989) ] (citing *Eckenrod*, 375 Pa.Super. 187, 544 A.2d [50,] 52 ( [1988] )). "A plaintiff must establish more than the presence of asbestos in the workplace. He must prove that he worked in the vicinity of the product's use." *Eckenrod*, [544 A.2d] at 52. However, he need not demonstrate the specific level or duration of his exposure. *Junge v. Garlock, Inc.*, 427 Pa.Super. 592, 629 A.2d 1027, 1029 (1993)[.]

*Andaloro v. Armstrong World Industries, Inc.* 799 A.2d 71, 86 (Pa.Super.2002) (quoting *Coward v. Owens–Corning*, 729 A.2d 614, 622–23 (Pa.Super.1999)). Nevertheless, *Eckenrod*'s threshold standard does not establish an immutable barrier to proof of asbestos claims:

[C]ausation of asbestos-related injuries is shown upon proof that the plaintiff inhaled *some* fibers from the products of the defendant manufacturer. *See Lilley v. Johns–Manville Corp.*, 408 Pa.Super. 83, 596 A.2d 203, 207 (1991); *Samarin v. GAF Corp.*, 391 Pa.Super. 340, 571 A.2d 398, 405 (1989). "Our case law includes

no requirement that a plaintiff in an asbestos case prove through [expert testimony] how many asbestos fibers are contained in the dust emissions from a particular asbestos containing product." *Junge v. Garlock*, 427 Pa.Super. 592, 629 A.2d 1027, 1029 (1993). Similarly, the plaintiff need not demonstrate the specific lengths of fibers contained in a manufacturer's product, the length of fibers he inhaled, or the overall concentration of fibers in the air. *Cf. Junge*, 629 A.2d at 1029.

*Andaloro*, 799 A.2d at 86 (emphasis altered).

Consistent with the direction presaged in *Andaloro*, our Supreme Court has more recently recognized that the frequency, regularity and proximity standards espoused in *Eckenrod* are subject to nuanced evaluation that vests considerable discretion in the court on summary judgment. In support of its holding, the Court adopted the rationale of the Unites States Court of Appeals in *Tragarz v. Keene Corp.*, 980 F.2d 411 (7th Cir.1992):

> *Tragarz* explains that these criteria do not establish a rigid standard with an absolute threshold necessary to support liability. *See id.* at 420. Rather, they are to be applied in an evaluative fashion as an aid in distinguishing cases in which the plaintiff can adduce evidence that there is a sufficiently significant likelihood that the defendant's product caused his harm, from those in which such likelihood is absent on account of only casual or minimal exposure to the defendant's product. *See id.* Further, *Tragarz* suggests that the application of the test should be tailored to the facts and circumstances of the case, such that, for example, its application should become "somewhat less critical" where the plaintiff puts forth specific evidence of exposure to a defendant's product. *See*

> *Tragarz*, 980 F.2d at 421. Similarly, under *Tragarz*, the frequency and regularity prongs become "somewhat less cumbersome" in cases involving diseases that the plaintiff's competent medical evidence indicates can develop after only minor exposures to asbestos fibers. *See id.* at 420.

*Gregg v. V–J Auto Parts Co.*, 596 Pa. 274, 943 A.2d 216, 225–226 (2007). We proceed accordingly in our evaluation, mindful that the enhanced discretion espoused in *Gregg* encourages adaptation of the factors announced in *Eckenrod*.

Fisher's first question challenges the trial court's determination that the evidence did not establish that Mr. Fisher suffered the requisite level of exposure to respirable asbestos during his use of Sexauer asbestos packing. Brief for Appellant at 9–11. Fisher argues that her husband's testimony established that some asbestos dust emanated from the dried packing and that, notwithstanding his rather speculative responses, inferentially, he must have inhaled some of it. *See id.* The trial court concluded, however, that notwithstanding his suggestion of airborne dust, Mr. Fisher did not report seeing dust and did not demonstrate that he inhaled dust on a frequent or regular basis. Trial Court Opinion, 7/25/11, at 6–8.

Upon review of the testimony, the trial court recognized the limited import of Mr. Fisher's testimony and determined correctly that his answers at deposition "[did] not establish that he inhaled asbestos from the Sexauer wicking and graphite packing products on a regular basis as required." *Id.* at 6. We find the court's interpretation entirely consistent with the record. Although Mr. Fisher remembered using Sexauer packing "throughout [his] plumbing career," N.T., Fisher Deposition, at 296, and cut it to fit around pipes, he had no

recollection of it creating any dust. The following exchange is illustrative:

Q. So, when you cut it, it didn't create much excess material?

A. No, I don't think so.

Q. Did you ever see any dust come off of it?

A. I didn't look for any dust, so I didn't see any.

Q. So you didn't see any dust?

A. No.

*Id.* at 297. On the single occasion that he reported seeing airborne dust, he related it to the Sexauer product by inference, merely noting that he kept some of the packing, among other things, at the bottom of his toolbox and would see dust when he turned the toolbox upside down to clean it out. *Id.* at 303–04. He did not comment, however, on the color or composition of the dust. Moreover, although Mr. Fisher opined that some of the dust came from the Sexauer product and "imagine[d]" that he had inhaled it when he dumped out the box's contents, he did not describe the regularity or frequency with which he cleaned the tool box. *Id.* at 304. In the absence of some specific testimony to the contrary, and given the nature and purpose of a toolbox, the factfinder would be remiss in inferring that Mr. Fisher's exposure was more than occasional, brief, and as it was outdoors, attenuated. *See Gregg,* 943 A.2d at 225 (reaffirming the role of the *Eckenrod* factors in distinguishing claims of actionable asbestos exposure from those in which exposure has been "casual or minimal"). Consequently, we find no error in the trial court's summary judgment ruling. The evidence of the decedent's exposure to Sexauer products, which consists of his own testimony, cannot be deemed sufficient to establish the frequency and regularity of exposure required by *Eckenrod,* and the trial court did not err in so finding.

■ In support of her second question, Fisher challenges the trial court's determination that the record does not establish questions of material fact concerning Mr. Fisher's exposure to respirable asbestos from Kentile products. Brief for Appellant at 14. Fisher asserts that her husband worked for extended periods on construction projects where Kentile floor tiles were being cut for installation, and that dust created during that process mingled with other dust on the floor that then became airborne when the sites were swept. Brief for Appellant at 14–15. The trial court concluded that Mr. Fisher's deposition testimony offered only speculation on the nature and extent of his exposure, as the asbestos content of the mingled dust could not be known. Trial Court Opinion, 7/25/11, at 10. Moreover, the court reasoned that not all Kentile flooring in use at the time contained asbestos. *See id.* ("[W]ithout Mr. Fisher's testimony identifying that he inhaled dust from Kentile flooring products which were specifically known to contain asbestos, Plaintiff's cause of action is based purely on speculation and therefore cannot be maintained as a matter of law.").

Upon review, we are again constrained to agree with the trial court's assessment. In so stating, we note that Kentile did acknowledge in discovery that "[a]ll other tiles, [*i.e.,* those not denoted as "asphalt tile" of vinyl sheet flooring"], whether denoted as such or not, were vinyl asbestos tiles." Kentile's Second Supplemental Response to Interrogatories, Reproduced Record (R.R.) at 145a–146a. Nevertheless, the evidence fails to sustain any significant question concerning Mr. Fisher's exposure, suggesting instead that his contact with Kentile floor tiles was incidental and attenuated. Although Mr. Fisher's testimony does show that Kentile was a commonly used brand and that substantial

quantities of it were used in the projects on which he worked, it does not indicate the decedent's exposure to any identifiable concentration of asbestos dust. The testimony suggests, instead, that Mr. Fisher was exposed to relatively modest quantities of an amalgam of dust common to work sites generally. Indeed, the following testimony, on which Fisher relies as evidence of significant exposure, appears to contradict that notion as it establishes that the floor was swept and dust created *prior* to the tile being cut:

Q. When this Kentile tile was cut, do you remember seeing anything happen to the tile when it was cut [sic]?

A. No, because I didn't look for anything. I didn't look that close.

Q. Was there never any context though, when you recall dust being created from the use of Kentile floor?

A. When they're working with Kentile or any other tile, the floor has to be clean.

Q. Right.

A. And if there was a big floor, they carry little brushes, and they might be brushing that stuff up throughout the day as they're working and that stirs up . . .

Q. The dust?

A. The material, yeah.

Q. So was that the context that you saw dust being created from a Kentile floor, then?

A. Yes, the dust being created, yeah.

N.T., Fisher Deposition at 305–06. Again, to the extent that the floor needed to be clear of dust for the installation of the tile, the reasonable inference available from the testimony is that the sweeping was done *before* the tile was cut and placed. Even if that were not the case, however, Mr. Fisher's testimony that tradesmen installing the tile "might be" brushing up debris on the floor throughout the day offers little to establish frequency, regularity, and in this instance, proximity, of the decedent's exposure. *See Gregg*, 943 A.2d at 227 ("[I]t is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in light of the evidence concerning frequency, regularity, and proximity of a plaintiff's/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between the defendant's product and the asserted injury"). Consequently, the evidence against Kentile falls short of raising a question of material fact concerning the requisite threshold of exposure. Accordingly, the trial court did not err in awarding summary judgment to Kentile.

■ In support of her third question, Fisher contends that the trial court erred in granting summary judgment to Pecora Corporation, the maker of Red Devil asbestos furnace cement with which Mr. Fisher worked on various projects during his career. Brief for Appellant at 16. Fisher argues that her husband's exposure to fibers emanating from Pecora's products is established by Mr. Fisher's testimony that he used Red Devil when he worked for his father in the 1940's and later when he installed and/or replaced a heating system in his in-laws' home. Brief for Appellant at 18–19. The trial court concluded that the decedent's testimony on the subject was too speculative, as he confirmed that he applied the material wet, which eliminated the possibility of airborne fibers, and responded indefinitely to critical questions bearing on whether he was exposed to asbestos dust. Trial Court Opinion, 7/25/11, at 10.

Following review of Mr. Fisher's testimony, we are constrained to agree with the trial court's assessment that the evi-

dence fails to raise a question of material fact concerning the decedent's exposure as defined by *Eckenrod.* As a starting point, we note that the testimony documents that application of Red Devil asbestos furnace cement was carried out when the product was wet, thus eliminating the possibility that fibers could become airborne during the application process. N.T., Fisher Deposition at 542. Although some of the product could sometimes stick to Mr. Fisher's clothing and later dry out, requiring him to shake the clothes out before laundering, he had no specific recollection that the process created any amount of dust. The following exchange is illustrative:

Q. How about when you would [apply the product], either with a trowel or with your hands or whatever you used to apply it, did there ever come a time when any of that material might dry, either on your equipment, on your clothing on where would you put it [sic]?

A. I imagine it would.

Q. And when it would dry, would you have to take it off your hands or your equipment?

A. I got to get it clean some way.

Q. I understand that. And when you would do that, what would happen to the material?

A. Okay. You just shake it off and throw it away.

Q. Did that process create any dust from your memory? Do you remember it creating dust?

A. I can't say that I remember specifically if it did, but I imagine that it did.

Q. Did it get on your clothes?

A. Yeah, she used to get after me for that.

Q. And how about at the end of the week, when she brought home your clothes, would you shake them at all and clean them up before you gave them to Beverly to wash?

A. I would shake them off the best I could, yes.

Q. And after you had been using that for some time during the week and you brought all the different coveralls home ... that you were wearing, would you shake that stuff out?

A. That was a normal operation of life.

Q. Right. And did that create dust when you did that?

A. I would imagine it did.

Q. And would you breathe in that dust?

A. You got to breathe all the time.

N.T., Fisher Deposition, at 542–45.

Unfortunately, this testimony attempts to derive the inferences necessary to prove the plaintiff's claim from speculation concerning what *may* have occurred as an ancillary effect of the product's use. What the evidence actually shows is that, during application, the Red Devil furnace cement was incapable of releasing respirable asbestos fibers. Moreover, to the extent that wet asbestos cement may have dried on Mr. Fisher's clothes, the suggestion that it should have transformed to dust when removed is not compelled by the evidence, but instead responds to the tendentious nature of the question counsel posed. In fact, Mr. Fisher's testimony allows the equal probability that dried cement may have been peeled from his clothing intact, and never became friable. Similarly, the implication that dust released from a plumber's clothing when shaken necessarily contained respirable asbestos that Mr. Fisher inhaled depends on speculation and guesswork for too many links in the necessary chain of evidence.[2] On the

2. Moreover, on the single job where Mr. Fisher could recall having disturbed dried Red

basis of such testimony, we simply cannot discern a question of material fact sufficient to withstand summary judgment. *See Gregg*, 943 A.2d at 227.

■ Finally, we consider Fisher's complaint in support of her first and third questions, that the trial court failed to consider the opinion of her expert, James Girard, Ph.D., who opined essentially that "each and every breath" contributes to the development of asbestos-related disease. *See Howard v. A.W. Chesterton Co.*, 31 A.3d 974, 983 (Pa.Super.2011). In view of the disease diagnosis in this case, we find minimal application for the information offered in Dr. Fisher's affidavit. In an apparent effort to explain how Mr. Fisher may have suffered asbestos exposure even where no asbestos dust was visible, Dr. Girard attested the following:

> It is generally accepted in the medical and scientific community that all asbestos products including gaskets, brake linings, packing, welding rods and cement, when abraded, handled, or installed release respirable asbestos fibers.
>
> \* \* \* \*
>
> It is generally accepted in the medical and scientific community that it is the respirable asbestos fibers that cause disease that are invisible to the naked eye.
>
> \* \* \* \*
>
> Levels of asbestos fibers as high as 10 to 20 asbestos fibers per cc of air are often invisible to the naked eye, yet the dust is respirable.
>
> \* \* \* \*
>
> Any witness herein who specified that when he or a coworker handled asbestos gaskets, packing, welding rods, brake linings or even cement products, that he did not see asbestos or other airborne fibers, was exposed to, and inhaled with-

out his knowledge, millions of asbestos fibers.

Girard Affidavit, 11/16/06, at 1.

In other cases, such evidence has prompted a re-examination of our Courts' historical reliance on the proximity, frequency and regularity factors espoused in *Eckenrod*. *See Howard*, 31 A.3d at 979 (quoting *Linster v. Allied Signal, Inc.*, 21 A.3d 220, 223–24 (Pa.Super.2011) ("[T]he frequency and regularity prongs become less cumbersome when dealing with cases involving diseases, like mesothelioma, which can develop after only minor exposures to asbestos fibers.")). As in *Howard*, we have acknowledged that given medical evidence germane to the development of mesothelioma, the need for proof of proximity, frequency and regularity of exposure, may be significantly diminished. *See id.* Indeed, we have recognized specifically that "a small amount of asbestos exposure may cause mesothelioma," and have held accordingly that in cases where the plaintiff's diagnosis *is* mesothelioma, a trial court commits reversible error in requiring proof on summary judgment that the plaintiff respired visible dust. We note, however, that no case expands that relaxation of the usual evidentiary mandate beyond the confines of a medical diagnosis of mesothelioma. In this case, the evidence documents that Mr. Fisher *did not* suffer from mesothelioma, but rather from small-cell carcinoma. In view of that diagnosis, as well as Mr. Fisher's substantial history of tobacco use, we find no basis for application of the attenuated exposure standard announced in *Howard*, and accordingly can accord only nominal consideration to Dr. Girard's opinion.

For the foregoing reasons, we conclude that the trial court did not err in granting

---

Devil furnace cement, in the process of replacing his in-laws' heating system, he did not

report seeing asbestos dust. N.T., Fisher Deposition, at 556–58.

summary judgment in favor of defendants Sexauer, Kentile, and Pecora. Accordingly, we affirm its order.

Order granting summary judgment **AFFIRMED**.